# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

       Plaintiff-Appellee,

v

ANTHONY RAY MCFARLANE, JR.,

       Defendant-Appellant.

UNPUBLISHED
June 19, 2018

No. 336187
Allegan Circuit Court
LC No. 14-018862-FC

Before: MURRAY, C.J., and MARKEY and TUKEL, JJ.

PER CURIAM.

Defendant, Anthony Ray McFarlane, Jr., appeals by right his jury conviction of first-degree child abuse involving his then nine-week-old infant, KM. See MCL 750.136b(2). The trial court sentenced defendant to serve 15 to 25 years in prison for his conviction. On appeal, defendant raises several claims of error that he argues warrant a new trial or resentencing. For the reasons explained below, we affirm defendant's conviction but remand for resentencing.

## I. SUFFICIENCY OF THE EVIDENCE

### A. STANDARD OF REVIEW

Defendant first argues that the prosecutor presented insufficient evidence to support his conviction of first-degree child abuse. This Court reviews a challenge to the sufficiency of the evidence by examining the "record evidence de novo in the light most favorable to the prosecution to determine whether a rational trier of fact could have found that the essential elements of the crime were proved beyond a reasonable doubt." *People v Roper*, 286 Mich App 77, 83; 777 NW2d 483 (2009). This Court must resolve all conflicts in the evidence in favor of the prosecution. See *People v Wilkens*, 267 Mich App 728, 738; 705 NW2d 728 (2005).

### B. ANALYSIS

To establish the elements of first-degree child abuse, the prosecution had to prove—in relevant part—that defendant "knowingly or intentionally cause[d] serious physical . . . harm" to KM. MCL 750.136b(2). Serious physical harm means "any physical injury to a child that seriously impairs the child's health or physical well-being, including, but not limited to, brain damage, a skull or bone fracture, subdural hemorrhage or hematoma, dislocation, sprain, internal injury, poisoning, burn or scald, or severe cut." MCL 750.136b(1)(f). Because the Legislature

-1-

provided that the perpetrator must "knowingly or intentionally" cause the serious physical harm, it is not sufficient for the prosecutor to prove that the defendant intended to commit the act that caused the physical harm; the prosecutor must prove that the "defendant intended to cause serious physical harm or knew that serious physical harm would be caused by [his or] her act." *People v Maynor*, 470 Mich 289, 291; 683 NW2d 565 (2004).

In this case, the prosecutor presented evidence that tended to suggest that defendant injured KM at some point on December 6, 2013, or earlier in the day on December 7, 2013.

KM's half-sister, KD, who was five years old on the day at issue, testified that she wanted defendant to play with her, but he wanted to play video games. After she began to cry, defendant became angry with her, punished her, and eventually spanked her. She said she went to her room but peeked into the living room when she heard KM crying. She saw defendant shaking KM.

Defendant suggests that KD's testimony was improbable because her timing was off and she failed to earlier disclose the shaking incident. When reviewing challenges to the sufficiency of the evidence, this Court must not interfere with the fact-finder's role in deciding the weight and credibility to give to a witness's testimony—"no matter how inconsistent or vague that testimony might be." *People v Mehall*, 454 Mich 1, 6; 557 NW2d 110 (1997); see also *People v Lemmon*, 456 Mich 625, 646-647; 576 NW2d 129 (1998). Rather, this Court must view the evidence in the light most favorable to the prosecution and uphold the verdict if a reasonable finder of fact could have found that the elements were proved beyond a reasonable doubt. See *People v Wolfe*, 440 Mich 508, 514-515; 489 NW2d 748 (1992). Therefore, we cannot disregard KD's testimony; instead, we must make every reasonable inference from her testimony in favor of the verdict. See *id.*

KD's testimony about the timing was not entirely clear. She did at first imply that the shaking incident occurred sometime immediately before defendant took her to his mother's house, which would have been early on Saturday, December 7, 2013. The children's mother, Dakota Chitwood, testified that KM was already showing signs of fussiness and pain by that time, and Chitwood was home and would likely have been in a position to witness the discipline had it occurred Saturday morning. However, KD later testified that the discipline occurred after she got home from school and before her mother got home from work. From KD's testimony a reasonable finder of fact could infer that the shaking incident occurred on Friday.

The prosecutor also presented expert testimony that KM had several injuries. Sarah Brown, D.O., a child abuse pediatrician, testified that KM had blood in the "space between her brain and her skull"—the "subdural space." The bleeding was "all over both sides of her brain." She also had a suspected tibia fracture, and Brown stated that an ophthalmologist observed bleeding in the back of KM's eye, which was referred to as retinal hemorrhages. Brown stated that KM's injuries could have been caused by someone violently shaking KM or by throwing her onto a couch or other soft surface. Brown acknowledged that KM had had a prenatal stroke, which caused the left hemisphere of KM's brain to shrink substantially. But she opined that KM's subdural hematomas and retinal hemorrhages were not attributable to her stroke. There was also testimony that the latter injuries arose during the time frame set forth in KD's testimony. Thus, when Brown's testimony is considered with KD's testimony that she saw

defendant shake KM, a reasonable jury could infer that defendant violently shook KM and that his acts caused her to suffer the identified injuries.

Further, it does not matter that the finder of fact must make multiple inferences to establish these elements. When considering the sufficiency of the evidence, this Court must consider the inferences that can be fairly drawn from the evidence, and "it does not matter that the evidence gives rise to multiple inferences or that an inference gives rise to further inferences." *People v Hardiman*, 466 Mich 417, 428; 646 NW2d 158 (2002). Finally, the Legislature specifically defined serious physical harm to include subdural hematoma. See MCL 750.136b(1)(f). As such, the prosecutor presented sufficient evidence to establish defendant's identity as the person who inflicted an act that caused a serious physical injury to KM. See *People v Yost*, 278 Mich App 341, 356; 749 NW2d 753 (2008) (noting that identity is an element of every offense). The only remaining issue is whether the prosecutor presented sufficient evidence to establish that defendant intended to cause serious physical harm or knew that serious physical harm would result. See *Maynor*, 470 Mich at 291, 295.

Because it is difficult to prove an actor's state of mind, the prosecution may rely on minimal circumstantial evidence to prove that the defendant had the required mental state. See *People v Unger*, 278 Mich App 210, 223; 749 NW2d 272 (2008). The evidence that defendant shook KM and that his shaking caused her injuries was sufficient to establish that defendant acted intentionally and caused her serious physical harm. Brown further opined that the acts that caused KM's injuries had to be violent. There was expert opinion to the contrary, but this Court must resolve that dispute in the prosecution's favor. *Wilkens*, 267 Mich App at 738. A reasonable finder of fact could find Brown's testimony credible and find that defendant shook KM violently. It could then further infer from the violence of the act that he either intended to cause her serious injury or knew that it was likely to do so. See *Unger*, 278 Mich App at 223.

The prosecutor presented sufficient evidence to permit a rational trier of fact to find that each element of first-degree child abuse had been proved beyond a reasonable doubt. See *Roper*, 286 Mich App at 83.

## II. INVADING THE PROVINCE OF THE JURY

### A. STANDARD OF REVIEW

Defendant next argues that the trial court erred when it allowed Brown to testify that she diagnosed KM with "definite pediatric physical abuse." He maintains that Brown's testimony amounted to an opinion that he was guilty. This Court generally reviews a trial court's decision to allow the admission of testimony for an abuse of discretion. See *Roper*, 286 Mich App at 90. However, it is an abuse of discretion to allow testimony that is inadmissible as a matter of law. See *People v Bynum*, 496 Mich 610, 623; 852 NW2d 570 (2014).

This Court reviews de novo whether the trial court properly interpreted and applied the rules of evidence. See *People v Duncan*, 494 Mich 713, 723; 835 NW2d 399 (2013). This Court also reviews de novo constitutional questions such as whether the trial court improperly allowed a witness to invade the province of the jury. *People v Shafier*, 483 Mich 205, 211; 768 NW2d 305 (2009). Because defendant did not object to Brown's testimony on this basis before the trial

-3-

court, this Court's review is limited to determining whether there was a plain error that affected defendant's substantial rights. See *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). To establish plain error that warrants relief, the defendant must show that the error was plain or obvious and affected the outcome of the lower court proceedings. *Id.*

## B. ANALYSIS

A trial court may permit testimony by a "witness qualified as an expert by knowledge, skill, experience, training, or education" if the court determines that "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." MRE 702. An expert may offer an opinion at trial if his or her testimony "is based on sufficient facts or data" and "is the product of reliable principles and methods," and if the witness "has applied the principles and methods reliably to the facts of the case." MRE 702. The trial court must also ensure that the expert's testimony is relevant. *Bynum*, 496 Mich at 624. Even when an expert's testimony is relevant, it remains subject to the limits imposed by MRE 403. *Id.* at 635 n 43.

This case required expert medical testimony because it was beyond the ken of ordinary persons to evaluate the medical evidence and assess the nature and extent of KM's injuries, the timing of those injuries, and the possible mechanisms of injury implicated by the medical evidence. See *People v Kowalski*, 492 Mich 106, 121-122; 821 NW2d 14 (2012). Moreover, if an expert's opinion is otherwise admissible, it does not become objectionable merely because "it embraces an ultimate issue to be decided by the trier of fact." MRE 704; see also *People v Smith*, 425 Mich 98, 106-107; 387 NW2d 814 (1986). Nevertheless, there are limits on an expert's authority to offer an opinion that embraces an ultimate issue:

> Although the ultimate issue rule no longer stands in the way of expert testimony stating opinions on crucial questions to be decided by the trier of fact, it is important that the expert witness not been permitted to testify about the requirements of law which apply to the particular facts in the case or to phrase his opinion in terms of a legal conclusion. In the former case, the claim is that the province of the judge is invaded, while in the latter, the contention is that the province of the jury is invaded. [*People v Drossart*, 99 Mich App 66, 75; 297 NW2d 863 (1980).]

As our Supreme Court explained in *People v Peterson*, 450 Mich 349, 374; 537 NW2d 857 (1995), quoting *People v Beckley*, 434 Mich 691, 721-722; 456 NW2d 391 (1990) (opinion by BRICKLEY, J.), where a jury has been confronted with one of society's most heinous offenses, there is a significant danger that the jury will give extra weight to an expert's testimony:

> "The use of expert testimony in the prosecution of criminal sexual conduct cases is not an ordinary situation. Given the nature of the offense and the terrible consequences of a miscalculation—the consequences when an individual, on many occasions a family member, is falsely accused of one of society's most heinous offenses, or, conversely, when one who commits such a crime would go unpunished and a possible reoccurrence of the act would go unprevented— appropriate safeguards are necessary. *To a jury recognizing the awesome*

-4-

*dilemma of whom to believe, an expert will often represent the only seemingly objective source, offering it a much sought-after hook on which to hang its hat.*" [Emphasis added by *Peterson*]

This case involved whether defendant intentionally injured KM by inflicting trauma to her brain. Because there was no external evidence of injury, her injuries involved a classic diagnosis of shaken baby syndrome or abusive head trauma. See *Sissoko v State*, ___ Md App ___; ___ A3d ___ (2018); slip op at 22-23 (tracing the history of the shaken baby and abusive head trauma diagnoses from 1860 to the present and discussing at length the modern controversy surrounding the diagnoses). The American Academy of Pediatrics adopted the term "abusive head trauma" in 2009 and defined it to mean the "constellations of injuries that are caused by the directed application of force to an infant or young child, resulting in physical injury to the head and/or its contents." *Id.* at ___; slip op at 23 (quotation marks and citations omitted). Thus, by definition, the diagnosis involves trauma caused by human agency, which the American Academy of Pediatrics labels abusive.

It remains the prevailing view in the medical community that there are "some internal findings that are highly correlated with abusive head trauma." *Id.* Consistent with this view, a physician may employ a differential diagnosis and conclude that the child's injuries were the result of abusive head trauma:

> [T]he consensus is that no single finding or combination of findings is pathognomonic for abusive head trauma. Rather, a differential diagnosis must be made based upon the totality of the circumstances in each individual case. A congruence of multiple findings, each of which independently correlates with abusive head trauma, narrows the field of potential diagnoses significantly, however, and absent a clinical history of accidental trauma or evidence of a disease process consistent with those findings, a diagnosis of abusive head trauma may be made. [*Id.* at ___; slip op at 25 (citation omitted).]

A minority of physicians and other scientists have identified changes in the understanding of the biomechanics of shaking and evidence that subdural hematomas, retinal hemorrhages, and brain swelling are not unique to head trauma caused by human agency. For that reason, those physicians and scientists believe it is impossible to reliably conclude that a particular child's injuries were the result of inflicted trauma. *Id.* at ___; slip op at 26. Although there is a debate about the reliability of such a diagnosis, courts continue to allow experts to offer such a diagnosis on the ground that it is an accepted and reliable diagnosis. *Id.* at ___; slip op at 27 (collecting cases that have generally upheld the admissibility of expert testimony opining that injuries of this nature were inflicted by human agency).

Our Supreme Court has recognized the debate within the medical community about the reliability of a diagnosis of shaken baby syndrome or abusive head trauma. *People v Ackley*, 497 Mich 381, 391-392; 870 NW2d 858 (2015). It has not, however, considered whether there are any limits on an expert's ability to diagnose abusive head trauma. Still, it has provided general guidance on the limits of expert testimony in analogous circumstances.

As a result of the danger that a jury might give too much weight to an expert's opinion on a matter involving an ultimate issue, our Supreme Court has imposed strict limits on expert testimony that "comes too close" to findings that are left exclusively to the jury. *Peterson*, 450 Mich at 374. For example, in cases involving criminal sexual conduct, an expert may not offer an opinion that the alleged victim had in fact been sexually abused, may not offer testimony that vouches for the victim's veracity, and may not offer an opinion that the defendant is guilty. See *id.* at 352. The same is true for expert testimony on "battered woman syndrome": the expert may not opine that the complainant was in fact a battered woman, may not testify that the defendant is guilty, and may not comment on the complainant's veracity. See *People v Christel*, 449 Mich 578, 580; 537 NW2d 194 (1995). Although an expert may be necessary to explain characteristics of gang culture, the expert may not offer an opinion that a particular gang member acted in conformity with character traits commonly associated with gang members and may not offer an opinion on the defendant's intent when he acted. See *Bynum*, 496 Mich at 630-634.

It is necessary for an expert to testify about the types of injuries typically observed with head trauma in children and to describe the possible mechanisms of injury involved. See *Kowalski*, 492 Mich at 121-122. Further, unlike the case with a diagnosis of sexual assault based on the emotional state and statements of the complainant, see *Smith*, 425 Mich at 112, a diagnosis that a child's head injuries were not accidental may be made on the basis of physical examination and scientific evidence rather than solely on the history provided by the complainant, see *Sissoko*, ___ Md App at ___; slip op at 25. Accordingly, contrary to defendant's contention on appeal, a physician may properly offer an opinion that, when the medical evidence is considered along with the child's history, the child's injuries were inflicted rather than caused by accident or disease because a jury is unlikely to be able to assess the medical evidence. See *Smith*, 425 Mich at 106 (recognizing that whether an expert is needed depends on whether the untrained layman would be qualified to determine the issue without the aid of an expert); *Drossart*, 99 Mich App at 79-82 (stating that the expert may not tell the jury how to decide the case, but may offer an opinion on an ultimate issue where the expert's experience and training is in an area that is largely unfamiliar to the jury). Expressing an opinion that the trauma was inflicted or not accidental does not impermissibly invade the province of the jury because the expert is not expressing an opinion of the defendant's guilt or whether the defendant had a culpable state of mind, which the expert may not do. See *Bynum*, 496 Mich at 630-633; *Peterson*, 450 Mich at 374; *Christel*, 449 Mich at 580. Instead, the expert is interpreting the medical evidence and offering the opinion that the trauma was caused by human agency, and the jury is free to reject that opinion on the basis of the evidence adduced at trial, including a contrary opinion by another expert. See *Drossart*, 99 Mich App at 81.

Notwithstanding the propriety of a diagnosis of inflicted trauma, we conclude that in cases involving allegations of abuse, an expert goes too far when he or she diagnoses the injury as "abusive head trauma" or opines that the inflicted trauma amounted to child abuse. The ordinary understanding of the term "abuse"—as opposed to neglect or carelessness—implies a level of willfulness and moral culpability that implicates the defendant's intent or knowledge when performing the act that caused the head trauma. An expert may not offer an opinion on the intent or criminal responsibility of the accused. *Bynum*, 496 Mich at 630-633.

Brown—who was admitted as an expert in child abuse pediatrics—testified generally about the nature of KM's condition and injuries. She described the possible mechanisms that

could cause the injuries and then stated that KM's injuries were inflicted rather than accidental or the result of her preexisting condition. Brown did not limit her diagnosis to her belief that KM's injuries were best explained as inflicted or not accidental; she opined that this case involved a "definite case of abusive head trauma." It was also evident from her testimony that abusive head trauma meant child abuse. She repeatedly told the jury that KM's injuries were "caused by definite pediatric physical abuse," and she stated that "we know that abusive head trauma" causes these injuries because people confess to hospital staff and investigators or other family members after inflicting the injuries. She also agreed that KM had suffered previous abuse even though she was only nine weeks old. She further told the prosecutor that she was correct when the prosecutor noted that Brown looked at the totality of the circumstances before concluding that this case involved "child abuse."

Brown's testimony that KM's injuries were caused by "abusive head trauma" or otherwise amounted to "child abuse" strongly suggested that it was her opinion that whoever inflicted the injuries on KM did so with culpable state of mind; that is, her testimony plainly implicated whether defendant "knowingly or intentionally" caused serious physical harm to KM within the meaning of MCL 750.136b(2). Because Brown was in no better position than the jury to assess the intent that defendant had when he acted, her belief that his actions were abusive or amounted to child abuse were irrelevant and inadmissible as a matter of law. See *Drossart*, 99 Mich App at 79-80. Consequently, the trial court plainly erred to the extent that it allowed Brown to use the phrase "abusive head trauma" to label her diagnosis rather than a less prejudicial label, such as inflicted or nonaccidental head trauma, and erred by allowing her to agree that KM's injuries amounted to "child abuse." See *Carines*, 460 Mich at 763. However, a plain error will not warrant relief unless the defendant demonstrates that the error affected the outcome of the lower court proceedings. See *id.*

Although Brown opined that KM's injuries were caused by definite pediatric physical abuse, she conceded that she could not say what actually happened to KM. She also testified that there were some people who felt that abusive head trauma was misdiagnosed. Moreover, defense counsel called three witnesses who testified that they did not agree with Brown's diagnosis: Julie Mack, M.D., who was a pediatric radiologist; Douglas Smith, M.D., who was a retired pathologist; and Joseph Sheller, M.D., who was a pediatric neurologist. The experts informed the jury that they did not believe that a medical professional could diagnose abuse. Mack testified that the medical records might give rise to a suspicion of abuse but opined that a medical professional cannot diagnose abuse. Smith also testified that the diagnoses of shaken baby syndrome or abusive head trauma were founded on flawed studies and that there was great controversy over whether a medical professional could make such diagnoses. Sheller similarly testified that the presence of the symptoms seen in KM would cause a reasonable pediatrician to be concerned about the potential for abuse, but that a suspicion does not mean abuse actually occurred. Sheller stated that the symptoms at issue were not an absolute sign of abuse. Given this testimony, the jury was well aware of the limits on Brown's opinion. Any prejudice occasioned by her characterization of the acts was minimal.

Although the prosecutor mentioned in her closing that Brown had characterized the symptoms as having been caused by abuse, she did not argue that the jury should rely on Brown's opinion when deciding whether defendant had the requisite intent to establish first-

degree child abuse. Instead, she argued that KD's account of events, the severity of the injuries, and defendant's subsequent actions tended to prove defendant's guilt.

There was evidence that KM became symptomatic while in defendant's care, and KD testified that she saw defendant shake KM at around that same time. The timing and eyewitness account permitted an inference that KM manifested her symptoms at that time because they were inflicted at that moment. A detective also reported that KD had reported that she had heard defendant yell "shut up" to KM. KD stated that defendant punished her when she cried at a time when he wanted to play video games. The evidence tended to suggest that defendant could become angry and frustrated by crying children. Brown also testified that KM's injuries were consistent with having been violently shaken. There was also testimony that defendant warned KD not to tell anyone and threatened to come after a neighbor if she or her husband said anything wrong about his statements to investigators. Defendant's statements suggest that he was conscious of his guilt. See *People v Sholl*, 453 Mich 730, 740; 556 NW2d 851 (1996).

The totality of the evidence strongly supported that defendant became angry with KM, violently shook her out of frustration, and caused the injuries at issue. Given the strength of the evidence, to the extent that the trial court plainly erred by allowing Brown to use the labels abusive head trauma or child abuse, we find it unlikely that the error affected the outcome of the trial. See *Carines*, 460 Mich at 763. Therefore, the error does not warrant relief. *Id*.

## C. INEFFECTIVE ASSISTANCE

Defendant also argues that defense counsel's failure to object to Brown's testimony amounted to ineffective assistance. Because the trial court did not hold an evidentiary hearing on defendant's claim that he did not receive the effective assistance of counsel, there are no factual findings to which this Court must defer, and this Court's review is for mistakes that are apparent on the record alone. *Unger*, 278 Mich App at 253. This Court reviews de novo whether defense counsel's acts or omissions fell below an objective standard of reasonableness under prevailing professional norms and whether, without the error, the result of the proceedings would have been different. *Yost*, 278 Mich App at 387. Counsel has wide discretion in matters of trial strategy and a defendant must overcome a strong presumption that defense counsel represented him competently. *Unger*, 278 Mich App at 242.

In his closing argument, defense counsel portrayed Brown as biased and untrustworthy. He argued to the jury that Brown's testimony was flawed and that she ignored important medical details and discounted evidence that led to a contrary diagnosis because she wanted to "sustain her beliefs." He also stated that Brown's testimony was nothing more than "her opinion," which could not be trusted because she deliberately left out information.

Given defense counsel's argument, he might reasonably have refrained from objecting to Brown's diagnosis of abusive head trauma and her references to abuse because her claim that she could diagnose child abuse furthered his argument that she was partial and not worthy of credibility. Because there was a plausible and legitimate strategic reason for defense counsel's decision not to object, it cannot be said that the failure to object fell below an objective standard of reasonableness under prevailing professional norms. See *id*. Additionally, as already explained, it is unlikely that that Brown's use of the label "abusive head trauma" affected the

outcome of the trial. As such, even if defense counsel should have objected, his failure to do so does not amount to ineffective assistance that warrants a new trial. See *id.*

Defendant has not established plain error or ineffective assistance that warrants a new trial.

### III. EVIDENCE OF TIBIA FRACTURE

On appeal, defendant argues that defense counsel should have objected to the evidence regarding a possible tibia fracture that KM may have had. He states that the testimony constituted improper other-acts evidence barred by MRE 404(b) and maintains that defense counsel's failure to object to the admission of the evidence amounted to ineffective assistance of counsel. Although defendant states that the testimony was inadmissible, he has not offered any substantive analysis of the evidence at issue. He also implies that the prosecutor's use of the evidence in closing was improper, but again he has not offered any meaningful analysis. To the extent that defendant might be arguing that the trial court plainly erred by allowing the evidence or that the prosecutor engaged in misconduct by arguing the evidence, defendant has abandoned those claims on appeal. See *People v Martin*, 271 Mich App 280, 315; 721 NW2d 815 (2006). For that reason, we limit our analysis to determining whether defendant has established that defense counsel's handling of this testimony and evidence amounted to ineffective assistance.

At trial, Brown testified that she examined KM's x-rays from her admission to Bronson and had some concern. She ordered a new bone survey on December 17, 2013. She testified that the new bone survey revealed that KM had a spiral tibia fracture. Although she acknowledged that the report from Bronson stated that KM's bone survey was normal, Brown stated that she recalled from memory that a physician from Bronson diagnosed KM with two fractures, but she could not forensically confirm one fracture. Brown did not otherwise offer any opinion as to when or how the fracture occurred. The prosecution rested after Brown's testimony.

The defense experts thereafter disagreed about whether the x-rays showed a fracture. Mack testified that the x-rays did not reveal a fracture. Even if she were to hypothesize that the films showed a fracture, she would have had to have concluded that the fracture was "weeks old" by the time of the x-rays. Smith did not offer an opinion on the x-rays other than to observe that the interpretations were inconsistent and depended on evidence of a periosteal reaction that was normally found in children who are growing because the periosteum was an active tissue that helps shape the bone during growth. Sheller, by contrast, agreed that the images showed a fracture, but he disregarded it in his opinion because it occurred before the date of the injuries at issue and was for that reason not relevant to his diagnosis.

The evidence that KM might have suffered a fracture at some point before the events at issue was inadmissible under MRE 402. In the absence of evidence connecting the fracture to defendant, it did not have "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401. Indeed, without evidence from which a reasonable jury could find that KM suffered the injury while under defendant's care and that the nature of the injury was consistent with having been inflicted by human agency, the evidence was not even relevant to

prove conduct in conformity with character, which would ordinarily be improper under MRE 404(b). See *People v VanderVliet*, 444 Mich 52, 68 & n 20; 508 NW2d 114 (1993) (recognizing that, consistent with MRE 104(a), the trial court must make a preliminary determination that a reasonable jury could find that the defendant committed the other act by a preponderance of the evidence before allowing the admission of the other acts evidence for a proper purpose). Even to the extent that the evidence might be admissible because Brown relied on it as a component of her differential diagnosis of abusive head trauma, the evidence was likely inadmissible under MRE 403 because it invited speculation by the jury, and the danger of unfair prejudice outweighed whatever marginal relevance the evidence might have had for purposes of the diagnosis. Nevertheless, even though this evidence was likely inadmissible, it does not follow that defense counsel provided ineffective assistance by failing to object to its admission.

As already discussed, this Court must affirmatively entertain the range of possible reasons that defense counsel might not have objected. *Unger*, 278 Mich App at 242. Defendant must overcome the strong presumption that trial counsel's strategy was reasonable. *Id*

In this case, the evidence of a tibia fracture was weak, and defense counsel elicited expert testimony that the evidence did not show a fracture or that the fracture was irrelevant to the diagnosis of the symptoms KM exhibited on the day at issue. The one defense expert who acknowledged the fracture stated that that type of fracture could have an innocent origin. Defense counsel also used the inconsistent and weak evidence of a fracture to challenge the credibility of the prosecution's experts. He suggested that the images that showed there was no fracture were deliberately excluded because it did not fit the prosecution's theory of the case.

On this record, it appears that defense counsel had a legitimate strategic reason for not objecting to testimony about the fracture: he had strong evidence to contradict the evidence, and it allowed him to challenge the credibility of the prosecution's experts. Defendant has not overcome the presumption that counsel employed sound trial strategy. See *id*.

## IV. OFFENSE VARIABLES 3 AND 7

### A. STANDARD OF REVIEW

Defendant next argues the evidence did not show that KM's injuries were life-threatening or permanent, or that he treated her with sadism, torture, excessive brutality, or conduct designed to substantially increase her fear and anxiety. As such, he maintains, the trial court erred when it assigned 25 points under Offense Variable (OV) 3 and assigned 50 points under OV 7.

This Court reviews for clear error a trial court's findings in support of particular score under the sentencing guidelines but reviews de novo whether the trial court properly interpreted and applied the sentencing guidelines to the findings. *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013).

### B. ANALYSIS

"When calculating the sentencing guidelines, a court may consider all record evidence, including the contents of a PSIR, plea admissions, and testimony presented at a preliminary examination." *People v McChester*, 310 Mich App 354, 358; 873 NW2d 646 (2015). It may

also consider a victim impact statement in a PSIR or other statement or letter submitted to the court for consideration on sentencing. See, e.g., *People v Earl*, 297 Mich App 104, 109-110; 822 NW2d 271 (2012). Further, the trial court may rely on inferences that arise from the record evidence when making the findings underlying its scoring of offense variables. *Id.* at 109.

A trial court must assess 25 points under OV 3, if it finds that "[l]ife threatening or permanent incapacitating injury occurred to a victim." MCL 777.33(1)(c). The trial court found that a score of 25 points was appropriate for OV 3. The trial court mentioned the possibility that the leg fracture might be permanently incapacitating but then indicated that there was not enough testimony to know whether the leg or other injuries would amount to incapacitating injuries. Nevertheless, it found that there were permanently incapacitating injuries to the brain and that the injury to the brain was potentially life threatening.

To the extent that the trial court found that defendant's actions caused a permanent incapacitating injury to KM, we find it clearly erred. See *Hardy*, 494 Mich at 438. There was no expert testimony about the long-term effects of the injury to KM's brain caused by her subdural hematomas. The prosecution's own expert, Brown, testified that she did not think they would "ever know if she's having neurological problems" as a result of the injuries she sustained on the day at issue because it "would be very difficult to figure out" whether the effects were from her "prenatal stroke" or from her head injury. She also opined that there would be no long-term effects from the tibia fracture or from her retinal hemorrhage. Nevertheless, there was evidence that KM's injuries were life threatening.

The record shows that KM had significant subdural bleeding, repeated seizures, and retinal hemorrhages, and that these injuries were severe enough that the treating physicians at the hospital where she first reported had her airlifted to a larger hospital. As such, the trial court did not clearly err when it found that KM's injuries were life threatening and assigned 25 points under OV 3. See MCL 777.33(1)(c).

The trial court also found that defendant used excessive brutality in the commission of the offense. Specifically, it noted the leg fractures and the extent of KM's brain injuries. For that reason, it assigned 50 points under OV 7.

The trial court had to assess 50 points under OV 7 if it found that that a "victim was treated with sadism, torture, excessive brutality or similarly egregious conduct designed to substantially increase the fear and anxiety a victim suffered during the offense." MCL 777.37(1)(a). Because the Legislature provided that the brutality must be—in relevant part—excessive, the trial court could only assign 50 points if it found that the abuse involved in this case exceeded the brutality that normally encompasses first-degree child abuse. See *Hardy*, 494 Mich 442-443 (noting that a trial court may normally consider conduct inherent in the crime, but holding that the legislature's use of the phrase "designed to substantially *increase* fear" required a showing that the actor engaged in conduct to increase the victim's fear beyond that normally involved in the crime); *People v Steanhouse (On Remand)*, 322 Mich App 233, 240; ___ NW2d ___ (2017) (stating that excessive brutality requires savagery beyond that usual for the crime).

The trial court clearly erred to the extent that it relied on the evidence of a leg fracture in scoring this variable. Even if the trial court found that KM actually suffered a leg fracture, as

already discussed, there was no record evidence tending to connect defendant to the fracture. And the jury specifically found that the injury that defendant caused was "abusive head trauma."

However, the trial court did not clearly err to the extent that it found that KM was subjected to excessive brutality in the commission of the first-degree child abuse. To be guilty of the charge, the defendant had to cause serious physical harm to KM, see MCL 750.136b(2), which means "any physical injury to a child that seriously impairs the child's health or physical well-being," MCL 750.136b(1)(f). Although serious physical harm necessarily includes subdural hemorrhages, a person can commit first-degree child abuse without causing such an injury. And in this case, there was evidence—albeit disputed—that defendant had to have violently shaken or thrown KM to cause the subdural hematomas and other injuries. The severity of the injuries supported a finding that KM was treated with brutality in excess of that which necessarily accompanies the commission of first-degree child abuse. See MCL 777.37(1)(a).

The trial court did not err when it scored OV 3 and OV 7.

## V. CLAIMS SUBMITTED UNDER STANDARD 4

Finally, defendant submitted a brief on his own behalf under Administrative Order No. 2004-6, Standard 4, 471 Mich c, cii (2004), in which he raised numerous claims of errors. Defendant did not raise any of the claims before the trial court. Therefore, they are all unpreserved. See *People v Bass*, 317 Mich App 241, 272; 893 NW2d 140 (2016). We review unpreserved claims of error for plain error that affected defendant's substantial rights. *Carines*, 460 Mich at 763. To establish a plain error that warrants relief, a defendant must show that the error was plain or obvious and affected the outcome of the lower court proceedings. *Id.* To the extent that defendant also argues that his trial and appellate counsel provided ineffective assistance, the trial court did not hold an evidentiary hearing. As such, this Court's review is limited to mistakes apparent on the record alone. *Unger*, 278 Mich App at 253.

Defendant argues that the trial court erred by relying on inadmissible evidence to score the sentencing variables. A sentencing hearing is not a criminal trial, and many of the constitutional requirements in criminal trial do not apply to sentencing. For example, the rules of evidence do not apply to sentencing. See *People v Uphaus (On Remand)*, 278 Mich App 174, 183-184; 748 NW2d 899 (2008); MRE 1101(b)(3). As such, the trial court could properly rely on any and all record evidence in sentencing defendant, including the contents of his presentence investigation report. See *McChester*, 310 Mich App at 358.

Defendant also maintains that the trial court erred by making judicial fact-findings, and he claims that he is entitled to a remand for a hearing as described in *People v Lockridge*, 498 Mich 358, 398-397; 870 NW2d 502 (2015). The trial court sentenced defendant under the now advisory sentencing guidelines. *Id*. at 399. For that reason, it could make findings of fact not found by the jury without violating his rights under the Sixth Amendment. See *People v Biddles*, 316 Mich App 148, 158-161; 896 NW2d 461 (2016). Further, defendant necessarily does not qualify for a remand hearing because those procedures apply only to sentences imposed on or before July 29, 2015. See *Lockridge*, 498 Mich at 397.

-12-

Defendant next argues that the trial court erred when it scored OV 10 and OV 13.  He claims that there was no evidence to support either score.  With regard to OV 10, he also states that victim vulnerability is necessarily subsumed within the offense of child abuse and, for that reason, should not be scored.

The trial court had to assess 10 points under OV 10, if it found that defendant "exploited a victim's "physical disability, mental disability, youth or agedness, or a domestic relationship, or the offender abused his or her authority status."  MCL 777.40(1)(b).  The fact that the offense of first-degree child abuse applies to children, see MCL 750.136b(1)(a), does not mean that the trial court may not consider the victim's youth for purposes of scoring OV 10; it should unless the Legislature provided otherwise.  See *Hardy*, 494 Mich at 441-442.  The Legislature did not provide that MCL 777.40(1)(b) does not apply to crimes against children.  Accordingly, the trial court could properly consider KM's youthfulness for purposes of scoring OV 10.  There was record evidence permitting an inference that defendant violently shook or threw KM when she was just nine weeks of age.  That evidence supported a score of 10 points under MCL 777.40.

As for OV 13, the trial court had to assign 25 points under that variable if it found that defendant's offense was part of a "pattern of felonious criminal activity involving 3 or more crimes against a person."  MCL 777.43(1)(c).  The trial court must count all crimes that occurred within a five-year period, which includes the sentencing offense; further, the court must count all offenses even if the offense did not result in a conviction.  MCL 777.43(2)(a).  As noted in defendant's PSIR, he was on bond for felonious assault when he committed the present offense, which, when counted with the sentencing offense, constituted two offenses against a person.  The trial court did not make any specific findings with regard to a third felony offense, so it is unclear how it arrived at the score of 25 points for this OV.  On this record, the trial court clearly erred to the extent that it found that defendant had committed three felony offenses against a person within the past five years.  See *Hardy*, 494 Mich at 438.

The trial court calculated defendant's total OV score to be 110, which placed him in grid VI/C with a range of 135 to 225 months.  See MCL 777.62.  After subtracting 25 points, the new score would place him in grid V/C and the new range would be 126 to 210 months.  MCL 777.62.  The trial court sentenced defendant to serve a minimum sentence of 180 months in prison, which was within the range provided under grid V/C.  Normally, because the error was not preserved for appellate review, defendant cannot show that he is entitled to be resentenced unless he does so through a claim of ineffective assistance of counsel during sentencing.  See *People v Francisco*, 474 Mich 82, 89 n 8; 711 NW2d 44 (2006).  On appeal, defendant asserts that his trial counsel was ineffective to the extent that he failed to raise any of the errors he now asserts on appeal.[1]  Had defense counsel raised this issue at sentencing, the trial court would have had to recalculate the applicable grid and sentence within the appropriate range.  Therefore, defendant has established that defense counsel's failure to raise this claim at sentencing fell

---

[1] Because we have concluded that defendant's remaining claims were without merit, defense and appellate counsel cannot be faulted for failing to raise those claims.  See *People v Riley*, 468 Mich 135, 142; 659 NW2d 611 (2003).

below an objective standard of reasonableness and prejudiced his sentencing. See *Yost*, 278 Mich App at 387. Accordingly, on this record, we agree that defendant is entitled to resentencing with zero points assessed under OV 13. See *Francisco*, 474 Mich at 92.

Defendant also asserts that his sentence was not proportionate and amounted to cruel and unusual punishment. Because defendant's sentence was within the range provided under the advisory sentencing guidelines, his sentence was presumptively proportionate, and a proportionate sentence is not cruel or unusual. See *People v Bowling*, 299 Mich App 552, 558; 830 NW2d 800 (2013). To overcome the presumption, defendant had to show that there was something unusual about the circumstances of his case that made the sentence disproportionate. *Id*. He has not identified any unusual circumstances beyond arguing that his sentence was invalid as a result of flaws in his trial and sentencing. In any event, defendant can raise this issue before the trial court on remand for resentencing.

Defendant also suggests that the trial court erred when it allowed KD to testify by video in violation of his right to confront the witnesses against him. Defense counsel, however, told the trial court that he had agreed with the prosecutor to allow certain witnesses—lay and expert—to testify via electronic communications. Moreover, defense counsel agreed that one of the witnesses was the mother of KM and KD, Chitwood, who had relocated out of state and was having transportation difficulties. So, he had to have understood that the child witness would also be testifying by video. By agreeing that the witnesses could testify by "any means that is available to allow them to testify," defense counsel waived any claim of error with regard to that procedure. See *People v Carter*, 462 Mich 206, 215; 612 NW2d 144 (2000). See also *People v Buie*, 491 Mich 294, 315; 817 NW2d 33 (2012) ("[I]f the decision constitutes reasonable trial strategy, which is presumed, the right of confrontation may be waived by defense counsel as long as the defendant does not object on the record.").

Defendant also asserts that the trial court erred when it allowed Brown to testify because she was biased; her opinion was not premised on sound science, and she was improperly allowed to offer an opinion on defendant's guilt. As already discussed, although there is disagreement within the medical community about the diagnosis of abusive head trauma, Brown could offer an opinion as to whether KM's injuries were inflicted by human agency. Further, while Brown's use of the term "abusive" to describe the head trauma may have been improper, that error did not warrant relief. Finally, whether Brown held a personal or professional bias was a proper subject for cross-examination; it was not grounds to preclude her from testifying. See *People v Layher*, 464 Mich 756, 764; 631 NW2d 281 (2001) (noting that showing bias is almost always relevant).

## VI. CONCLUSION

We affirm but remand for resentencing consistent with this opinion. We do not retain jurisdiction.

/s/ Christopher M. Murray
/s/ Jane E. Markey
/s/ Jonathan Tukel