*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
October 27, 2022

Plaintiff-Appellant,

v

No. 357826
Macomb Circuit Court
LC No. 2019-002969-FC

COLLIN CHRISTOPHER QUINT,

Defendant-Appellee.

*In re* CAQ, Minor.

No. 360666
Macomb Circuit Court
Family Division
LC No. 2018-000312-NA

Before: LETICA, P.J., and SERVITTO and HOOD, JJ.

PER CURIAM.

These consolidated appeals involve legal proceedings stemming from severe injuries sustained by CAQ, then 10 weeks old, that were discovered after CAQ had been left in father's care.[1] In Docket No. 357826, the prosecution appeals by leave granted[2] the sentence imposed on father (255 days' incarceration and 24 months' probation) as a result of his no-contest plea conviction of second-degree child abuse, MCL 750.136b(3). We agree that the trial court erred in its scoring of offense variables (OVs) 3 (physical injury to victim) and 7 (aggravated physical

---

[1] Father is the defendant in Docket No. 357826 and respondent in Docket No. 360666.

[2] *People v Quint*, unpublished order of the Court of Appeals, entered October 25, 2021 (Docket No. 357826).

abuse) and that correct scoring of these variables increases father's recommended minimum-sentence guidelines range, thereby requiring resentencing.

In Docket No. 360666, petitioner appeals by leave granted[3] an order finding that termination of father's parental rights was not in CAQ's best interests. Petitioner argues that the trial court erred by placing too much weight on the alleged bond between CAQ and father, as the bond was outweighed by the serious, life-altering injuries father inflicted and the risk of future abuse. We are definitely and firmly convinced that the trial court's best-interest finding rises to the level of clear error. We therefore reverse the order appealed in Docket No. 360666 and remand for entry of an order terminating father's parental right to the minor child.

## I. BACKGROUND

The events leading up to the initiation of the child protection proceedings are largely undisputed. Mother[4] went to work early in the morning on August 1, 2018, leaving CAQ in father's care. CAQ had an "episode" that day, during which he appeared to go limp. Panicked, father called the paternal grandfather for advice and was instructed to call CAQ's primary care doctor. Father tried to do so, but the doctor's office was closed for lunch hours. By that time, CAQ was alert again and appeared normal—the incident was apparently short lived. When mother got home from work, they were able to contact CAQ's doctor, who advised them to take CAQ to Beaumont Hospital for a head ultrasound. Mother and father took CAQ to Beaumont as advised, where he was diagnosed with breath holding spells. The treating physicians instructed the parents to monitor CAQ and, if he had another episode, they should blow on his face, turn him on his side, or put a wet wash cloth on his face. After a chest x-ray revealed no concerns, CAQ was discharged. Father took CAQ home and put him to bed without incident.

CAQ had one or two additional breath holding episodes on August 2, 2018, so father blew on his face as instructed by the emergency physicians at Beaumont. CAQ became alert again. Mother and the maternal grandmother arrived at the apartment around noon, where mother, father, and the maternal grandmother discussed going to another hospital for a second opinion since Beaumont did not perform the ultrasound recommended by CAQ's family doctor. During this conversation, mother noticed CAQ's leg shaking. Believing that he was cold, she wrapped him in a swaddle. While father and the maternal grandmother were installing a car seat base so they could all go to the hospital together, CAQ began shaking or convulsing and appeared to be having a seizure. The maternal grandmother called 911, and CAQ was transported by ambulance to McLaren Hospital. After the emergency room staff stabilized CAQ, he was transferred to Children's Hospital for further examination and treatment.

---

[3] *In re CAQ Minor*, unpublished order of the Court of Appeals, entered May 5, 2022 (Docket No. 360666). This order also consolidated these appeals on the Court's own initiative. *Id*.

[4] Mother was initially a respondent in the child protective proceedings, but the trial court determined that petitioner failed to establish grounds for exercising jurisdiction with respect to mother and dismissed her from the petition.

At Children's Hospital, a head CT scan showed bilateral subdural fluid collection and evidence of an acute subdural hematoma on the right side of CAQ's brain. A subsequent ophthalmological examination revealed extensive multilayer retinal hemorrhages, including severe vitreous hemorrhages. An MRI performed 12 days after CAQ's admission reflected evidence of an acute subdural hematoma and substantial damage to the parenchyma. The radiologist who interpreted the MRI also identified what he believed to be evidence of ligamentous injury to CAQ's cervical spine, though this opinion was refuted by defense experts. The treating physicians and experts presented by petitioner at the adjudication trial were all of the opinion that CAQ's injuries were caused by nonaccidental head trauma (NAHT), with several of them agreeing that the injuries could have been caused by violent shaking or a repeated, forceful back and forth motion. The defense experts, on the other hand, believed CAQ's injuries were secondary to previously asymptomatic birth trauma.

After the trial court in the child protective proceedings adjudicated father, father pleaded no contest to second-degree child abuse in his criminal proceedings. The statutory sentencing guidelines recommended a minimum-sentence range of 0 to 17 months, and the trial court imposed a sentence in the middle of this range—255 days in jail and two years' probation. The child protective proceedings continued with several additional hearings regarding the termination petition, after which the trial court found that father caused CAQ's injuries and there was a reasonable likelihood of injury in the future, such that his parental rights could be terminated under MCL 712A.19b(3)(b)(*i*) (parent's act caused physical injury or abuse), (j) (reasonable likelihood of harm), (k)(*iii*) (parent abused child involving battering, torture, or other severe physical abuse), and (k)(*v*) (parent abused child involving life-threatening injury). Nonetheless, the trial court declined to terminate father's parental rights because it determined that doing so was not in CAQ's best interests.

## II. SCORING ERRORS

In Docket No. 357826, the prosecution argues that the trial court erred in its scoring of OVs 3 and 7. We agree.

"This Court reviews the sentencing court's scoring of a sentencing guidelines variable for clear error." *People v Armstrong*, 305 Mich App 230, 242; 851 NW2d 856 (2014). "The trial court's findings are clearly erroneous if, after we have reviewed the entire record, we are definitely and firmly convinced that it made a mistake." *Id*.

In determining the minimum sentencing range recommended by the statutory sentencing guidelines, the trial court must score the variables "by reference to the record," and its findings must be supported by a preponderance of the evidence. *People v Osantowski*, 481 Mich 103, 111; 748 NW2d 799 (2008). The record evidence includes "the contents of a [presentence investigation report], plea admissions, and testimony presented at a preliminary examination." *People v McChester*, 310 Mich App 354, 358; 873 NW2d 646 (2015). Reasonable inferences arising from the record evidence may also be relied upon by the trial court. *People v Barnes*, 332 Mich App 494, 499; 957 NW2d 62 (2020).

OV 3 addresses physical injury to the victim. MCL 777.33(1). If "[l]ife threatening or permanent incapacitating injury occurred to a victim," the court must assess 25 points. MCL

777.33(1)(c). Only 10 points are to be assessed for "[b]odily injury requiring medical treatment . . . ." MCL 777.33(1)(d). This Court has previously adopted the dictionary definition of "life-threatening" for purposes of this variable, which defines the term as "capable of causing death : potentially fatal." *People v Chaney*, 327 Mich App 586, 589; 935 NW2d 66 (2019) (quotation marks and citation omitted). The focus of the inquiry is not on the defendant's actions, but rather on the nature of the victim's injuries. *Id*. at 590. In *Chaney*, the trial court assessed 25 points because the victim sustained serious burn wounds that required lengthy hospitalization and multiple procedures. *Id*. Because there was no evidence that the victim's "life was placed at risk or more general evidence that the injury suffered was by nature life-threatening," the trial court clearly erred by scoring 25 points. *Id*. at 591. In this case, the trial court assessed 10 points for OV 3, reasoning that CAQ's were undoubtedly serious, but not "life threatening" and it was unclear whether CAQ's injuries would be permanent.

Although a panel of this Court opted to consolidate these appeals, we remain mindful that the lower court proceedings were not consolidated, thereby limiting the record from which the trial court could make findings in support of its sentencing guidelines scoring. In their appellate briefs, both the prosecution and father rely on testimony from their respective experts during the trial in the child protective proceedings. Both parties, at the direction of the trial court during a May 25, 2021 hearing, provided similar summaries of the expert testimony in their sentencing memorandums, but it does not appear that the relevant transcripts were actually produced for the trial court's consideration at sentencing.

Considering only the record in the criminal case, the trial court had very limited information available to it. Father did not make any relevant admission in the context of his no-contest plea. The agent's description of the offense from father's presentence investigation report notes that CAQ was diagnosed with "cervical ligament damage, shoulder ligament damage, retinal hemorrhage, brain hemorrhage and physical brain damage." It also asserts that the attending physician at Children's Hospital deemed CAQ's injuries nonaccidental and consistent with signs of child abuse, possibly in the form of shaken baby syndrome. The victim-impact statement from the maternal grandmother reports that CAQ was involved in physical, occupational, and speech therapies, had weakness on the left side of his body, and used a walker, but was able to feed himself and crawl to the bathroom for toilet training.

The only other significant source of information available to the trial court was the preliminary examination testimony, wherein mother testified about the circumstances leading up to CAQ's hospitalization, and Dr. Bradley Tilford described CAQ's condition during his hospitalization. According to Dr. Tilford's preliminary examination testimony, CAQ was transferred to the Children's Hospital emergency department from an outside hospital. He continued to have repeated seizures and was treated with an antiseizure medication. Because the medication could cause respiratory problems, CAQ was intubated before being admitted to the pediatric intensive care unit. A CT scan revealed evidence of an acute subdural hematoma, and the later MRI reflected bilateral subdural fluid collections and injury to the brain parenchyma that involved significant "volume loss of the brain." CAQ also had bilateral diffuse multilayer retinal hemorrhages and some evidence of a ligamentous injury in his cervical spine.

Although Dr. Tilford did not specifically identify CAQ's injuries as life threatening, such a conclusion is easily inferred from the nature of CAQ's injuries and the treatment those injuries

necessitated. Without suggesting that all brain injuries or seizures are life threatening, CAQ's condition was serious enough that his medical providers determined the antiseizure medication was warranted, even with the attendant risks of respiratory failure. That CAQ's physicians were willing to assume a risk that was itself potentially fatal implies that CAQ's injuries were life threatening in the normal course and support a score of 25 points for OV 3. Despite the limited record evidence, we are left with a definite and firm conviction that the trial court erred by failing to assess 25 points for OV 3 on the basis of CAQ's life-threatening injuries. MCL 777.33(1)(c); *Chaney*, 327 Mich App at 589-591. See also *People v McFarlane*, 325 Mich App 507, 533; 926 NW2d 339 (2018) (affirming 25-point score when the infant victim had subdural bleeding, repeated seizures, and retinal hemorrhaging severe enough to require speedy transfer to a larger hospital).

OV 7 addresses aggravated physical abuse. MCL 777.37. MCL 777.37(1)(a) directs the trial court to assess 50 points if it finds "[a] victim was treated with sadism, torture, excessive brutality or similarly egregious conduct designed to substantially increase the fear and anxiety a victim suffered during the offense." "For purposes of OV 7, excessive brutality means savagery or cruelty beyond even the usual brutality of a crime." *People v Rosa*, 322 Mich App 726, 743; 913 NW2d 392 (2018) (quotation marks and citation omitted). The trial court declined to assess any points under this variable, reasoning that the evidence did not meet the "extremely high" bar necessary for a 50-point score.

As it did below, the prosecution relies principally on this Court's opinion in *McFarlane*, 325 Mich App 507, to support its position that 50 points should have been assessed for OV 7. The defendant in *McFarlane* was convicted of first-degree child abuse involving his nine-week-old daughter. *Id*. at 512. The victim's injuries included subdural bleeding, a suspected tibia fracture, and retinal hemorrhages. *Id*. at 515. This Court determined that the trial court did not clearly err by assessing 50 points under OV 7 because the victim sustained subdural hemorrhages that were not necessary to constitute first-degree child abuse and there was evidence suggesting that the defendant caused those injuries by violently shaking or throwing the victim. *Id*. at 534. According to this Court, the severity of the victim's injuries implied that she was "treated with brutality in excess of that which necessarily accompanies the commission of first-degree child abuse." *Id*.

The facts at hand are indeed analogous to *McFarlane* in terms of the injuries sustained by the respective victims and the evidence concerning causation. As noted above, the evidence before the trial court indicated that CAQ's injuries included an acute subdural hematoma, retinal hemorrhaging, distinct injury to the brain parenchyma, and a possible ligamentous injury to his cervical spine. Dr. Tilford testified that these injuries were likely caused by NAHT, and father's presentence investigation report noted that the injuries were consistent with shaken baby syndrome and may have been inflicted over a period of days. Relevant to this case, a defendant is guilty of second-degree child abuse if he or she by "knowingly or intentionally commit[ted] an act likely to cause serious physical or mental harm to a child regardless of whether harm results." MCL 750.136b(3)(b). The nature of the injuries involved in this case fall within the statutory definition of "serious physical harm," but are not necessarily involved in every case of second-degree child abuse. See *McFarlane*, 325 Mich App at 534. See also MCL 750.136b(1)(f) (including brain damage and subdural hemorrhage or hematoma within the scope of serious physical harm). Like in *McFarlane*, there was evidence here that CAQ's injuries were caused by violent shaking leading to what was once commonly known as shaken baby syndrome. Considering the obvious parallels

between this case and *McFarlane*, we conclude the trial court clearly erred by failing to assess 50 points under OV 7.

As scored by the trial court, father had zero prior record variable points and 20 OV points, placing him in the A-II cell of the Class C sentencing grid, which recommends a minimum sentence between 0 and 17 months. Had the trial court correctly assessed 25 points for OV 3 and 50 points for OV 7, father's guidelines score would have placed him in the A-VI cell, and his recommended minimum-sentence range would have been 29 to 57 months. MCL 777.64. Because the erroneous scoring of OVs 3 and 7 altered father's recommended minimum-sentence range, we vacate his sentence and remand for resentencing. *People v Francisco*, 474 Mich 82, 91-92; 711 NW2d 44 (2006).

## III. CAQ'S BEST INTERESTS

In Docket No. 360666, the prosecution challenges the trial court's finding that termination of father's parental rights was not in CAQ's best interests. This Court reviews the trial court's findings regarding a child's best interests for clear error. *In re White*, 303 Mich App 701, 713; 846 NW2d 61 (2014). "A finding is clearly erroneous if the reviewing court is left with a definite and firm conviction that a mistake has been made." *In re LaFrance Minors*, 306 Mich App 713, 723; 858 NW2d 143 (2014). We are persuaded that the court clearly erred in this regard.

In cases involving certain forms of aggravated abuse, the Legislature has chosen to require petitioner to seek termination of the perpetrator's parental rights at the initial disposition. MCL 722.638(2). In doing so, however, it explicitly incorporated the standard procedure for termination proceedings set forth in MCL 712A.19b. *Id.* ("[T]he department shall include a request for termination of parental rights at the initial dispositional hearing as authorized under section 19b of chapter XIIA of 1939 PA 288, MCL 712A.19b."). Thus, even in cases involving aggravated abuse, termination of parental rights can only be ordered "[i]f the court finds that there are grounds for termination of parental rights *and* that termination of parental rights is in the child's best interests . . . ." MCL 712A.19b(5) (emphasis added). See also *In re Ferranti*, 504 Mich 1, 16; 934 NW2d 610 (2019) (describing procedures for child protective proceedings).

At the best-interest stage, the trial court's focus must be on the child, rather than the parent. *In re Schadler*, 315 Mich App 406, 411; 890 NW2d 676 (2016). "In deciding whether termination is in the child's best interests, the court may consider the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home." *In re Olive/Metts Minors*, 297 Mich App 35, 41-42; 823 NW2d 144 (2012) (citations omitted). The respondent's domestic violence and visitation history are also relevant considerations. *White*, 303 Mich App at 714. Although a child's placement with a relative caregiver must be considered and generally weighs against termination, *In re Gonzales/Martinez*, 310 Mich App 426, 434; 871 NW2d 868 (2015), CAQ was placed with mother, who does not qualify as a "relative" for purposes of these proceedings, *Schadler*, 315 Mich App at 413.

The trial court noted that there was obviously a bond between father and CAQ, that father's parenting ability was an open question, and that permanence and finality were not big factors in light of CAQ's placement with mother. The court also acknowledged that father was convicted of

second-degree child abuse, but did not place significance on father's failure to admit responsibility for CAQ's injuries. On that point, the trial court commented, "[W]e are making our best judgment as to what happened but we were not there." We infer from this comment that the trial court was reluctant to reach a negative inference on the basis of father continuing to maintain his innocence. The court also observed that father was not provided services in this case and appeared to consider that the providing of services to father would allow all to find out whether father might not pose a risk to CAQ in the future.

To the extent petitioner argues the evidence did not support the trial court's finding regarding the parent-child bond, its position is unpersuasive. Petitioner's contention that the foster-care worker—the only "qualified witness" did not observe a bond is unsupported by the record. The foster-care worker testified that CAQ's communication deficits made it difficult to assess his connection with father, but ultimately opined that "there is a bond between them." Moreover, the foster-care worker only supervised a handful of parenting-time visits, while mother was involved in every visit. Although mother believed father's claim of innocence and was clearly biased in his favor, there was no evidence suggesting that she misrepresented or exaggerated CAQ's strong bond with father. Moreover, we are confident that the trial court was cognizant of mother's bias and took it into account in determining the weight to afford her testimony.

Petitioner further argues that termination was appropriate because the risk of future harm to CAQ outweighed the importance of his bond with father. It is well settled that a parent-child bond may be outweighed by other considerations regarding a child's best interests, and our caselaw is replete with opinions affirming termination of parental rights despite evidence of a bond. See, e.g., *In re Rippy*, 330 Mich App 350, 361-362; 948 NW2d 131 (2019); *In re Jones*, 316 Mich App 110, 120-121; 894 NW2d 54 (2016); *In re Brown/Kindle/Muhammad Minors*, 305 Mich App 623, 638; 853 NW2d 459 (2014).

Petitioner directs this Court's attention to *In re VanDalen*, 293 Mich App 120; 809 NW2d 412 (2011), a case involving nonaccidental injuries in which this Court affirmed termination of parental rights. In that case, LV was hospitalized at the time of his two-week checkup because of concerns regarding oral lesions. *Id*. at 123. A skeletal survey obtained during LV's hospitalization revealed a tibia fracture that appeared to be consistent with child abuse. *Id*. The respondents were unable to account for the lesions or fracture. *Id*. After the trial court assumed jurisdiction, the respondent-mother admitted to the foster-care worker and LV's relative caregiver that the respondent-father engaged in troubling behavior like covering LV's nose and pulling on LV's legs. *Id*. at 124. Moreover, while the respondent-mother cooperated with services and diligently pursued reunification, the respondent-father was noncompliant, and it was made clear to the respondent-mother that his lack of cooperation could be problematic in her case if they remained together. *Id*. The respondents ended their relationship, and the respondent-mother asked that LV never be left alone with the respondent-father. *Id*. LV was eventually returned to the respondent-mother's care. *Id*. at 125. The court dismissed its jurisdiction over LV and entered a custody order regarding the respondent-father's parenting time. *Id*.

Unknown to the caseworker, the respondents had reunited around the same time that the court dismissed jurisdiction. *Id*. at 125. The respondent-mother became pregnant with the respondents' second child several months later. *Id*. at 126. After leaving the younger child, DV, in the respondent-father's care, the respondent-mother found DV on the floor, whimpering,

whining, and unable to wake up. *Id*. at 126-127. The respondents disagreed about whether DV needed medical attention and ultimately decided not to take her to the hospital. *Id*. at 127. DV continued to act abnormally the following day, but they did not take the child to the doctor until three days later. *Id*. at 128. DV began having seizures at the doctor's office and was immediately taken to the hospital. *Id*. Subsequent testing revealed brain damage, retinal hemorrhaging, and numerous fractures of varying ages in her ribs, back, leg, and toes. *Id*. at 129. A child abuse pediatrician opined that DV's injuries were the result of shaken baby syndrome "caused by more than one episode of 'severe shaking,' which could have been fatal," and that DV would likely have "permanent brain damage resulting in motor problems, problems with the use of her arms or legs, or both, delayed walking, problems with decreased strength and tone, likely physical and cognitive delays or impairments, and possible vision damage." *Id*. at 129-130. This Court affirmed the trial court's best-interest determination, reasoning that "[c]ompelling evidence indicated that the children would not be safe in respondents' custody considering that both children suffered unexplained injuries consistent with serious abuse while in respondents' primary care." *Id*. at 141.

This case is similar in terms of the injuries involved and the parents' initial inability to explain how those injuries occurred. It is also distinguishable, in that the *VanDalen* respondents were provided services but appeared not to benefit from those services, and the *VanDalen* children's need for permanence and stability strongly favored termination because they were thriving with foster parents who wished to adopt them. In this case, the court did not find grounds to exercise jurisdiction over CAQ with respect to mother, and he was returned to her care after the adjudication trial. Thus, as the trial court noted, CAQ does not want for permanence or stability— he has both with mother and a strong family support system.

Nevertheless, it cannot be ignored that CAQ is still a young child, made even more vulnerable than before due to the injuries inflicted upon him by father. Incredibly, father testified he did not believe CAQ had any special needs, despite the numerous medical records, testimony, and services provided to CAQ clearly establishing the contrary. In addition, during the course of the proceedings, father was in a serious accident while under the influence of alcohol and illegal drugs and suffered a traumatic brain injury as a result. While the accident is concerning by itself, even more concerning is that father did not disclose to either his examining psychologist or psychiatrist that he was highly intoxicated when the accident occurred. While it is true that father was not provided with services in this matter to address any substance abuse issue he may have, the fact remains that when his son was undergoing a plethora of services to address the injuries that the trial court found father had inflicted upon him, father elected to engage in behavior that was contrary to his well-being. And, although father was not provided with services in this matter, he also did little to nothing on his own to establish that termination was not CAQ's best interests. Considering the full record and the preponderance of the evidence standard applicable to a best-interest analysis (see *In re Moss*, 301 Mich App 76, 90; 836 NW2d 182 (2013)), we are left with a definite and firm conviction that the trial court erred by declining to terminate father's parental rights.

IV. CONCLUSION

In Docket No. 357826, we vacate father's sentence and remand for resentencing consistent with this opinion. In Docket No. 360666, we reverse the trial court's finding that termination of

father's parental rights was not in CAQ's best interests and remand for entry of an order terminating father's parental right to the minor child. We do not retain jurisdiction.

/s/ Anica Letica
/s/ Deborah A. Servitto
/s/ Noah P. Hood