*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

KHAFRA CORTEZ CHAPPLE,

        Defendant-Appellant.

UNPUBLISHED
January 11, 2024

Nos. 355562; 363656
Grand Traverse Circuit Court
LC No. 19-013319-FC

Before: GLEICHER, C.J., and GARRETT and MALDONADO, JJ.

PER CURIAM.

These consolidated appeals arise from defendant Khafra Cortez Chapple's participation in a scheme to clone and fraudulently use others' credit cards, leading to a charge of conducting a criminal enterprise, MCL 750.159i(1). While jailed and awaiting trial, Chapple instructed a friend to remotely delete the contents of Chapple's iPhone, yielding a charge of tampering with evidence, MCL 750.483a(6)(b). During another recorded jail conversation Chapple allegedly authorized a "hit" on his co-defendant's twin brother, and the prosecution added charges of witness intimidation by threat to kill or injure, MCL 750.122(7)(c), and witness retaliation, MCL 750.122(8). A jury convicted Chapple as charged, and the court imposed consecutive sentences.

Chapple challenges the admission of hearsay evidence and expert testimony, and argues that his consecutive sentence is disproportionate. Because a police interview with Chapple's codefendant played for the jury was inadmissible hearsay and its admission likely affected the outcome at trial, we reverse Chapple's convictions of witness tampering and witness intimidation and remand for a new trial on those charges.[1]

---

[1] Chapple does not challenge any of the evidence underlying his criminal-enterprise and tampering-with-evidence convictions, so we affirm these. And given our resolution of this case we need not address Chapple's argument concerning consecutive sentencing.

## I. BACKGROUND

Chapple and codefendant Deandre Halimon were childhood friends. The prosecution alleged that in 2019, they hatched a scheme to use "cloned" credit cards to purchase gift cards and merchandise at Meijer stores. Chapple and Halimon paid for their purchases at self-service checkout kiosks using cloned cards, trying various cards until the checkout card reader recognized a valid credit card number. Their purchases were then fraudulently charged to that account.

Meijer security staff knew of the cloned credit card scheme and implemented programs to detect customers using multiple cards declined by card readers. In August 2019, security staff at a Meijer store in Acme in Grand Traverse County detected Chapple and Halimon using cloned cards. They were arrested and charged with conducting a criminal enterprise. A search of their U-Haul truck revealed numerous items and gift cards purchased from Meijer. Additional evidence supported that Chapple and Halimon made purchases with cloned cards at Meijer stores in Midland, Bay City, Cadillac, and Mount Pleasant.

Chapple was detained in the Grand Traverse County Jail and his iPhone was seized. He made several recorded calls from jail, precipitating new charges. In one call, Chapple asked a friend to use a Find My iPhone application to remotely delete the contents of Chapple's iPhone. This request led to the charge of tampering with evidence. In a call with Marshawn Mitchell, Chapple brought up that Halimon had accepted a plea offer and was listed as a prosecution witness, referring to Halimon as a "snitch." Chapple told Mitchell to "green light" Halimon's "other half." The prosecution theorized that "green light" meant to order "a hit," i.e., solicit a homicide, and that Halimon's "other half" was his twin brother, Demetrius Halimon (Demetrius). Charges of intimidating and retaliating against a witness followed.

Halimon was subpoenaed to appear for Chapple's preliminary examination and for the original trial date, but did not appear either time. Halimon disobeyed a third subpoena by failing to appear at Chapple's September 2020 trial. In light of his absence, the trial court agreed to admit Detective Sergeant Jarrod Bilacic's recorded interview with Halimon under MRE 804(b)(6), the hearsay exception for statements by a declarant whose unavailability was procured by the wrongdoing of the opposing party. The court stated that Chapple, "through his phone calls, through his securing or representations regarding a green light," engaged in intimidating behavior "that ultimately did, in the Court's view, lead to the unavailability of [Halimon.]" But before the recorded interview could be played for the jury, defense counsel informed the court that Halimon had contacted him and was willing to testify. The trial court allowed Halimon to testify by Zoom.

During his Zoom testimony, Halimon acknowledged being charged with conducting a criminal enterprise and pleading guilty to using a fraudulent transaction device, and lying to police "due to activities [he] engaged in with Mr. Chapple . . . ." He also admitted that he and Chapple were "[u]sing [credit cards] illegally." But Halimon denied ever seeing Chapple possess any fraudulent cards, and claimed that he was "too high" to remember Chapple "doing anything" the day they were arrested, or ever going into any Meijer stores." He ultimately claimed that he alone was involved in using the fraudulent cards.

Pertinent to the legal issues presented on appeal, the prosecution also questioned Halimon about his understanding of the meaning of the term "green light," earlier statements he made during

the police interview regarding that term, Chapple's use of the term, and whether the term was equivalent to a threat. Here is a relevant portion of the testimony:

> *Q.* On December 5th of 2019, you reached out to Detective Sergeant Bilacic. Why did you do that?
>
> *A.* Say that one more time.
>
> *Q.* On December 5th of 2019, you reached out to Detective Sergeant Jarrod Bilacic saying you wanted to speak with him. Why did you do that?
>
> *A.* Oh, because I spoke to him about my name being on a witness list that I heard about. And I just called down there to talk to him about that specifically, and he started speaking about something else.
>
> *Q.* How did you hear that your name was on a witness list?
>
> *A.* Say it again?
>
> *Q.* How did you hear that your name was—
>
> *A.* Word of mouth. Word of mouth. Nobody—nobody specific—nobody specific, just word of mouth.
>
> *  *  *
>
> *Q.* Do you recall the conversation with Detective Sergeant Bilacic that day?
>
> *A.* Yeah.
>
> *Q.* Okay.
>
> Do you recall talking about the term "green light"?
>
> *A.* Yep.
>
> *Q.* Okay. What does green light mean in your community?
>
> *A.* Green light mean [sic] many things in my city.
>
> *Q.* Okay. Do you recall what you told Detective Sergeant Bilacic about what it means?
>
> *A.* I told Officer Bilacic—can you hear me?
>
> *Q.* Yes, we can hear you.
>
> *A.* Yes, I remember what I told him.

*Q.* What did you tell him?

*A.* I didn't tell him that when Khafra Chapple said green light that it meant what I told him it meant. I'm going to put that there.

*Q.* Okay. That's not my question, sir.

What did you tell Detective Sergeant Bilacic about what green light means?

*A.* I told him that it means what he thinks.

*Q.* Okay.

*A.* I told Officer Bilacic that green light means what he thinks.

*Q.* And had he told you what he thought it meant?

*A.* Excuse me?

*Q.* Why were you telling him that it meant what he thought it meant?

*A.* Because he—if that's what he thought it meant, that's what he thought it meant. I don't know.

*Q.* No. So he said that it means a hit, and you said it means what you think it means; is that right?

*A.* Yeah. But I never said Khafra Chapple gave a hit on my brother. I even let him know in that room that I never think he would do that. That we're close friends. That—

*Q.* You're saying that you told—

*A.* —that's unacceptable. I'm not hearing it.

You said what?

*Q.* Are you telling me that you told Detective Sergeant Bilacic that you're close friends with Khafra Chapple?

*A.* Yes.

*Q.* On December 5th, you are saying that you told Detective Sergeant Bilacic that you and Khafra Chapple are close friends?

*A.* Yes.

*Q.* Okay.

Detective Sergeant Bilacic asked you if green light means a hit; is that right?

*A.* No, I don't recall that.

*Q.* Okay.

He told you that he thought it meant a hit. Do you remember that?

*A.* No, I don't recall that.

*Q.* So when you told him that it means what you think it means, what were you saying?

*A.* I don't know. I don't recall saying anything like that. My connection is going out bad.

*Q.* Do you remember saying "mm-hmm" when he asked it meant a hit?

*A.* No, I don't recall that.

Defense counsel had no questions for Halimon. The prosecutor then renewed his request to admit the recording of Detective Bilacic's interview with Halimon as substantive evidence. He argued that Halimon was still an unavailable witness because he did not recall most of his interview with Bilacic and because Chapple had procured Halimon's unavailability through threats and intimidation.

The trial court admitted the entirety of Halimon's 25-minute long recorded interview under MRE 804(b)(6), additionally finding that Halimon was unavailable under both MRE 804(a)(2) (declarant persists in refusing to testify concerning the subject matter of the declarant's statement) and (3) (declarant lacks memory of the subject matter of the declarant's statement). The court reasoned as follows:

Certainly the declarant, that being Mr. Halimon, evidenced on multiple occasions throughout his testimony today a lack of memory. It got to be a little silly, in fact. I thought he was a politician. He kept saying over and over again that he didn't remember, did not recall. In fact, anytime there was something relating specifically to the actions of Mr. Chapple, he made sure to indicate that he didn't remember, that he didn't know. Further, I do find that that action constitutes a refusal to testify concerning the subject matter of the statement.

He did refuse, when asked—he did not cooperate, is, I think, a better way to put it. He did not cooperate with the questions of the prosecutor when asked about the meaning of green light. When asked about many of the other matters involving Mr. Chapple and involving [Halimon's] phone calls to [Demetrius], involving his concerns over his brother, he—he clearly, to the Court's mind, was attempting to avoid anything that might implicate him in the eyes of Mr. Chapple and in the eyes of his community. I find he was unavailable for those purposes[.]

-5-

Alternatively, the court concluded that the recorded interview was admissible to impeach Halimon's credibility.

At the outset of the recorded interview, Bilacic asked Halimon what Halimon thought the term "green light" meant. Halimon replied "I don't know," but volunteered that "people at home . . . [have] been receiving threats."[2] During the conversation that followed, Bilacic asked if the term generally means "a hit," and Halimon said, "Mm-hmm." Bilacic explained that Chapple had made numerous statements about "green lighting you." The two also discussed Halimon's name being on the witness list for Chapple's case, with Halimon expressing concern about this. At one point, Halimon said, "S**t happen[s] to people who take [the] stand[]." Next, Bilacic brought up Chapple's statements about "green lighting" the "other half," and Halimon said he had a twin brother, Demetrius. Halimon stated that Demetrius told him "it's not safe," but Halimon denied that Demetrius "received" any threats. Halimon said he did not feel safe because "there's some s**t being said." He elaborated, "I just wanna be safe out there because I know what's going on." Halimon said others had told him about Chapple trying to "turn people against" him. Halimon later told Bilacic that the term "green light is definitely what you think it is." Halimon and Bilacic also agreed that Halimon should advise his family members to maintain a low profile.

The recorded interview also contains statements made by Bilacic that were highly incriminating and had no relationship to the subject matter of the "green light" conversation. For example, Detective Bilacic told Halimon that he had heard about "rap lyrics" threatening Halimon or his brother and that it "seemed like" people in Halimon's brother's orbit were being killed. Bilacic commented on Chapple's criminal history and the prosecutor's charging habits; advised that Chapple's phone calls had been "cut off" so that he "couldn't do any more damage than he's already done"; speculated about what Chapple thought about Halimon's plea deal; boasted that he (Bilacic) had Chapple "dead to nuts on this charge," had "been told" that "shit happens to people" in Halimon's community, and that Chapple was "definitely cooking up something that didn't happen" and had "much worse of a record than you do." Bilacic volunteered: "I've got so much evidence on him I don't really need you," and "If I could have gotten even more stuff . . . I probably would have had more charges on him." Halimon reported and repeated at least one more time during the interview comments made by his brother and others that Chapple was trying to "turn people against" them.

Detective Sergeant Sean Street worked for the Michigan State Police and was stationed within the Inkster Police Department. Chapple and Halimon were from Inkster. Street investigated homicides and nonfatal shootings in that city, and was qualified as an expert at trial in the use of slang terminology in the Inkster community. Street opined that "green light" meant to order "a hit."

The defense called two witnesses: Chapple and his cousin, Marshawn Mitchell. Both testified that "green light" did not mean a hit. Mitchell stated that it meant "okay, yes," or "Go. Like, you good." Chapple testified that "when I told Marshawn when you see the other half, green light" he was referring to "the other half of the money he owed me, which he knew what he owed

---

[2] There is no transcript of the interview, and some of Halimon's answers are difficult to hear.

me." Chapple denied threatening Halimon or Demetrius, agreeing that they were "like family" to him, and that he loved them "like a brother."

The jury convicted Chapple on all charges, and he now appeals.

## II. ANALYSIS

### A. HALIMON'S RECORDED POLICE INTERVIEW

Chapple argues that the trial court erred by admitting Halimon's recorded police interview at trial. He contends that the interview was inadmissible both as substantive evidence and as impeachment.

We review a trial court's decision to admit evidence for an abuse of discretion. *People v Edwards*, 328 Mich App 29, 34; 935 NW2d 419 (2019). An abuse of discretion occurs when the trial court's decision falls outside the range of reasonable and principled outcomes. *People v Baskerville*, 333 Mich App 276, 287; 963 NW2d 620 (2020). Any preliminary questions of law, including whether evidence is inadmissible under the rules of evidence, are reviewed de novo. *People v McDaniel*, 469 Mich 409, 412; 670 NW2d 659 (2003). However, we review a trial court's factual findings regarding the unavailability of a witness for clear error. *People v Sardy*, 313 Mich App 679, 695; 884 NW2d 808 (2015), vacated in part on other grounds 500 Mich 887 (2016). "A finding is clearly erroneous when, although there is evidence to support it, the reviewing court is left with a definite and firm conviction that a mistake has been made." *People v Lanzo Constr Co*, 272 Mich App 470, 473; 726 NW2d 746 (2006).

Hearsay is defined as "a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." MRE 801(c). Generally, "[h]earsay is not admissible except as provided by these rules." MRE 802. MRE 804 provides exceptions to the general prohibition of hearsay evidence for certain statements made by a declarant who is unavailable.

Chapple argues that Halimon was not unavailable as required by MRE 804(b)(6), thereby precluding its application. Chapple takes particular issue with the trial court's finding that Halimon was unavailable as defined by both MRE 804(a)(2) and (3), which provide that a declarant may be considered unavailable where the declarant "persists in refusing to testify concerning the subject matter of the declarant's statement despite an order of the court to do so," MRE 804(a)(2), or the declarant "has a lack of memory of the subject matter of the declarant's statement," MRE 804(a)(3). We discuss each ground for admission individually.

#### 1. MRE 804(b)(6)

As relevant here, MRE 804(b)(6) provides an exception to the general prohibition of hearsay evidence for "[a] statement offered against a party that has engaged in or encouraged wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness." "To admit evidence under MRE 804(b)(6), the prosecution must show by a preponderance of the evidence that: (1) the defendant engaged in or encouraged wrongdoing; (2) the wrongdoing was intended to procure the declarant's unavailability; and (3) the wrongdoing did procure the

-7-

unavailability." *People v Burns*, 494 Mich 104, 115; 832 NW2d 738 (2013). As did the Supreme Court in *Burns*, we will assume that the trial court correctly found that Chapple engaged in wrongdoing. We will also assume that Chapple's wrongdoing was intended to procure Halimon's unavailability.

Halimon was not "unavailable," however, as he attended the trial by Zoom and testified. Chapple's wrongdoing did not "procure" Halimon's unavailability because despite the what we assume to be Chapple's *efforts* to procure Halimon's unavailability, those efforts did not succeed. As discussed in greater detail below, Halimon was sometimes evasive, at other times cagey and non-responsive, and certainly a difficult witness. But MRE 804(b)(6) applies when a party's wrongdoing successfully prevents a witness's testimony altogether, or when due to the defendant's wrongdoing the witness appears but refuses to testify, or professes a complete loss of memory of the subject matter. None of those things happened here. Halimon's testimony was not as clear as the prosecution wanted it to be, but his efforts to dodge the prosecutor's questions did not make him unavailable under MRE 804(b)(6).

2. MRE 804(a)(2): Refusal to Testify

MRE 804(a)(2) states that " 'Unavailability as a witness' includes situations in which the declarant . . . *persists* in refusing to testify concerning the subject matter of the declarant's statement despite an order of the court to do so." (Emphasis added). The trial court erred by finding Halimon unavailable under MRE 804(a)(2). Halimon's answers were occasionally convoluted and contradictory. He professed a lack of recall of parts of his interview with Bilacic, his statements regarding the meaning of "green light," and the alleged threat from Chapple. But Halimon did testify at trial, submitting to extensive questioning by the prosecutor spanning more than 20 pages of transcript.

The plain language of MRE 804(a)(2) requires that the witness "persist" in refusing to testify regarding a previous statement. Halimon never refused to answer a question. In fact, he did answer some questions regarding the meaning of "green light," stating "I told Officer Bilacic that green light means what he thinks," admitting at one point that both he and Detective Bilacic understood and agreed on the term's meaning:

> *Q*. So he said that it means a hit, and you said it means what you think it means; is that right?
>
> *A*. Yeah. But I never said Khafra Chapple gave a hit on my brother. I even let him know in that room that I never think he would do that. That we're close friends. That—

For the sake of completeness, we note that our research has not revealed any cases in other jurisdictions presenting similar facts. A leading text discussing Rule 804(a)(2), the federal

equivalent to MRE 804(a)(2),[3] supports that a declarant is not "unavailable" under the circumstances presented here:

> Obviously, showing this kind of unavailability involves calling the declarant, putting questions that elicit his refusal to answer, and then getting a court order directing him to testify. Representing that he will not testify is usually not enough to prove unavailability, although a clear and careful statement indicating an unbending refusal to cooperate is sometimes thought sufficient, and a mere claim of privilege is not the same as refusing to testify. The Rule contemplates a refusal to testify *despite judicial pressures* to do so. While it refers only to a court order, usually it is appropriate for the judge to tell the witness that continued refusal will put him in contempt and subject him to incarceration or other punishment. Such warnings test the refusal, and represent a reasonable effort to persuade the witness to change her stance on the matter, and to testify after all. [5 Federal Evidence (4th ed), Ch 8, § 111.

Similarly, Wright & Miller's treatise suggests that a refusal to testify must be far more certain and deliberate than Halimon exhibited here:

> Consistent with Rule 804(a)(1), the declarant's noncooperation cannot be assumed or speculative. Conclusory assertions that the declarant will not cooperate or is unlikely to testify will not suffice. Unavailability is only established under Rule 804(a)(2) if the declarant refuses to testify "despite judicial pressures to do so"; the specific pressure the rule contemplates is a court order directed at the declarant, which the declarant resists. [Wright and Miller, Fed Prac & Proc (2023 ed), Ch 9A, § 6965.

We note that the court was never asked to order Halimon to answer a question more directly, and did not do so on its own.

Given Halimon's participation at trial, and that he did in fact testify and did not refuse to answer the questions put to him, we are left with a definite and firm conviction that the trial court made a mistake by finding that he persisted in refusing to testify under MRE 804(a)(2).

### 2. MRE 804(a)(3): Lack of Memory

MRE 804(a)(3) provides that a declarant is unavailable when the declarant "has a lack of memory of the subject matter of the declarant's statement." Whether Halimon was unavailable

---

[3] Federal Rule of Evidence 804(a)(2) states: "A declarant is considered to be unavailable as a witness if the declarant: . . . refuses to testify about the subject matter despite a court order to do so." Notably, the federal rule does not contain the phrase "persists in refusing to testify."

due to "a lack of memory of the subject matter of [his] statement[s]" under MRE 804(a)(3) presents a somewhat closer question than his availability under MRE 803(a)(2).

Chapple argues that Halimon was not unavailable under this provision because Halimon recalled participating in the police interview, demonstrating his memory of the subject matter at issue. According to Chapple, a declarant that "cannot remember the subject matter of an event at all . . . is unavailable under MRE 804(a)(3)," whereas a declarant that "can recall the subject matter—but not necessarily the details of an encounter— . . . is available for questioning." The prosecution contends that the trial court correctly determined Halimon to be unavailable under MRE 804(a)(3) because he "was not cooperating in answering the questions" and "specifically and repeatedly stated that he did not remember his statements to Sergeant Bilacic."

The record is not nearly as straightforward as either side claims.

The statement that the prosecution sought to introduce through the admission of Halimon's videotaped interview was that the term "green light" meant a "hit." At the beginning of his testimony, Halimon readily admitted having spoken with Detective Bilacic:

> *Q*. On December 5th of 2019, you reached out to Detective Sergeant Bilacic. Why did you do that?
>
> *A*. Say that one more time.
>
> *Q*. On December 5th of 2019, you reached out to Detective Sergeant Jarrod Bilacic saying you wanted to speak with him. Why did you do that?
>
> *A*. Oh, because I spoke to him about my name being on a witness list that I heard about. And I just called down there to talk to him about that specifically, and he started speaking about something else.
>
> *Q*. How did you hear that your name was on a witness list?
>
> *A*. Say it again?
>
> *Q*. How did you hear that your name was—
>
> *A*. Word of mouth. Word of mouth. Nobody—nobody specific—nobody specific, just word of mouth.

He further testified that he recalled discussing the term "green light" with the detective:

> *Q*. Do you recall the conversation with Detective Sergeant Bilacic that day?
>
> *A*. Yeah.
>
> *Q*. Okay.
>
> Do you recall talking about the term "green light"?

-10-

*A.* Yep.

*Q.* Okay. What does green light mean in your community?

*A.* Green light mean [sic] many things in my city.

*Q.* Okay. Do you recall what you told Detective Sergeant Bilacic about what it means?

*A.* I told Officer Bilacic—can you hear me?

*Q.* Yes, we can hear you.

*A.* Yes, I remember what I told him.

*Q.* What did you tell him?

*A.* I didn't tell him that when Khafra Chapple said green light that it meant what I told him it mean. I'm going to put that there.

*Q.* What did you tell Detective Sergeant Bilacic about what green light means?

*A.* I told him that it means what he thinks.

*Q.* Okay.

*A.* I told Officer Bilacic that green light means what he thinks.

*Q.* And had he told you what he thought it meant?

*A.* Excuse me?

*Q.* Why were you telling him that it meant what he thought it meant?

*A.* Because he—if that's what he thought it meant, that's what he thought it meant. I don't know.

*Q.* No. *So he said that it means a hit, and you said it means what you think it means; is that right?*

*A.* *Yeah.* But I never said Khafra Chapple gave a hit on my brother. I even let him know in that room that I never think he would do that. That we're close friends. That—

*Q.* You're saying that you told—

*A.* —that's unacceptable. I'm not hearing it. [Emphasis added].

-11-

Although somewhat difficult to parse, Halimon admitted that "green light" meant a "hit," confirming what Bilacic thought it meant. Halimon then expressed disbelief that Chapple "gave a hit on my brother."

We acknowledge that Halimon's testimony was a mixture of contradictions, lack of recall, and nonresponsive assertions directed at exculpating Chapple. And Halimon repeatedly responded that he did not remember or did not recall various things, including (1) telling Demetrius or another person that Chapple wanted to "green light" his "other half," (2) telling his brother and the other person that Chapple was about to catch another charge for green lighting, (3) the other person asking him "who the f**k is he green lighting" and him responding "my other half," and (4) warning his brother that people had been "greenlighted on him" and to "lay low." But Halimon testified about the subject matters of his earlier statements. He recalled discussing the term "green light" with Bilacic, stating that "it mean[s] many things in my city" and verifying Bilacic's understanding of a "green light" as a hit. Halimon also explicitly stated that Demetrius did not receive any threats, and adamantly denied ever telling Bilacic that Chapple put out a hit out on Demetrius.

Once again, we find very little published Michigan case law regarding this evidentiary rule. The Wright & Miller text points out that "[v]irtually all witnesses forget some aspects of the subject matter to which they testify; few remember nothing at all. The real world witness inevitably falls in between." Wright and Miller, § 6966, p []. One federal court has expressed, under the analogous federal rule of evidence to that here, that "[t]he fact that the witness does not remember making the statements themselves is irrelevant" to the witnesses' unavailability for lack of memory because "Rule 804(a)(3) applies only if the declarant is unable to remember the 'subject matter,' i.e., if 'he has no memory of the events to which his hearsay statements relate.' " *Lamonica v Safe Hurricane Shutters, Inc*, 711 F3d 1299, 1317 (CA 11, 2013) (citations omitted).[4]

We need not adopt the *Lamonica* approach to hold that the trial court clearly erred by finding that Halimon displayed a lack of memory rendering him unavailable under MRE 804(a)(3). At one point in his testimony Halimon admitted that Bilacic's interpretation of "green light" was accurate; at other points he was not as forthright. But Halimon answered most of the questions put to him about the subject matter of his "green light" conversation with Detective Bilacic. True, toward the end of his testimony he denied "having a conversation" with the detective or confirming during that conversation that "green light" means a hit. But Halimon had already testified extensively regarding the subject matter of his conversation with Detective Bilacic. The contradictions in his testimony did not suggest a lack of memory of the subject matter of his previous statements, to which he had already testified. Rather, Halimon's denials and evasions suggested that he was lying or covering up. A witness's misbehavior is not equivalent to unavailability under MRE 804(a)(3). The trial court clearly erred by finding otherwise.

---

[4] Federal caselaw is not binding precedent, but it may be considered as persuasive authority in resolving a question of state law. *People v Rogers*, 338 Mich App 312, 327; 979 NW2d 747 (2021).

### 3. Admissibility of the Recorded Interview as Impeachment Evidence

The trial court also ruled that the recorded interview qualified as "impeachment evidence," supporting its admission. This, too, constituted clear error.

 "When a witness claims not to remember making a prior inconsistent statement, he may be impeached by extrinsic evidence of that statement." *People v Shaw*, 315 Mich App 668, 683; 892 NW2d 15 (2016) (quotation marks and citation omitted). "However, [t]he purpose of extrinsic impeachment evidence is to prove that a witness made a prior inconsistent statement—not to prove the contents of the statement." *Id*. (quotation marks and citation omitted; alteration in original). MRE 613(b) addresses the admissibility of extrinsic impeachment evidence:

> Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require. This provision does not apply to admissions of a party-opponent as defined in Rule 801(d)(2).

But even if admitted, a prior inconsistent statement may be used only to impeach credibility. The admitted statement "is not regarded as an exception to the hearsay rule because it is not offered as substantive evidence to prove the truth of the statement, but only to prove that the witness in fact made the statement." *Merrow v Bofferding*, 458 Mich 617, 631; 581 NW2d 696 (1998).

When a party seeks to impeach a witness with an inconsistent statement, "a proper foundation must be laid by questioning the witness concerning the time and place of the statement and the person to whom it was allegedly made." *People v Rodriguez*, 251 Mich App 10, 34; 650 NW2d 96 (2002). Here, the prosecutor failed to lay an adequate foundation for use of the recorded statement as impeachment evidence. To lay that foundation "the proponent of the evidence must elicit testimony inconsistent with the prior statement, ask the witness to admit or deny making the first statement, then ask the witness to admit or deny making the later, inconsistent statement, allow the witness to explain the inconsistency, and allow the opposite party to cross-examine the witness." *Barnett v Hidalgo*, 478 Mich 151, 165; 732 NW2d 472 (2007). The prosecution made no effort to lay the proper foundation for Halimon's impeachment with any statements regarding the meaning of "green light" that Halimon made during the recorded interview.

The trial court compounded that error by admitting the video recording as substantive evidence. Instead of redacting the majority of the interview and playing for the jury only the portions that constituted prior inconsistent statements, the court allowed the prosecutor to present irrelevant, inadmissible, and highly prejudicial evidence. Nor did the court inform the jury that any prior inconsistent statements contained within the interview could not be considered as evidence of Chapple's guilt. In sum, Halimon's recorded police interview was inadmissible, both as substantive and impeachment evidence.

### 4. Harmless Error

We now address whether these evidentiary errors warrant reversal. MCL 769.26 provides:

-13-

No judgment or verdict shall be set aside or reversed or a new trial be granted by any court of this state in any criminal case, on the ground of misdirection of the jury, or the improper admission or rejection of evidence, or for error as to any matter of pleading or procedure, unless in the opinion of the court, after an examination of the entire cause, it shall affirmatively appear that the error complained of has resulted in a miscarriage of justice.

This statute "presumes that a preserved, nonconstitutional error is not a ground for reversal unless 'after an examination of the entire cause, it shall affirmatively appear' that it is more probable than not that the error was outcome determinative." *People v Lukity*, 460 Mich 484, 495–96; 596 NW2d 607 (1999). "In other words, the effect of the error is evaluated by assessing it in the context of the untainted evidence to determine whether it is more probable than not that a different outcome would have resulted without the error." *Id*. at 495.

We conclude that it is more probable than not that the error in admitting the entire videotaped interview was outcome-determinative. In a recorded phone call, the jury heard Chapple ask Mitchell to "green light" Halimon's "other half." Detective Street testified that "green light" in this context meant a solicitation of murder. Chapple and Mitchell denied this, explaining that "green light" merely referred to approving an action. The witness-retaliation and witness-intimidation charges turned on the jury's interpretation of this term, and to a lesser extent, the term "other half." Although Halimon equivocated at trial regarding his understanding of the meaning of "green light," he was definite about his understanding of the term in his recorded interview, when he agreed that the term meant to solicit a hit, consistent with Bilacic's understanding. And while Halimon adamantly denied at trial that Chapple ever threatened Demetrius, his improperly admitted statements included some indications he and Demetrius, and others, were concerned about Chapple's comments and their safety.

Equally significant, much of the conversation presented to the jury in the recorded interview was laden with inadmissible hearsay and highly prejudicial statements made by both Halimon and Detective Bilacic that were not cumulative of other evidence. It included Detective Bilacic's inadmissible comments regarding Chapple's guilt. See *People v Heft*, 299 Mich App 69, 81; 829 NW2d 266 (2012) ("A witness may not opine about the defendant's guilt or innocence in a criminal case."). Accordingly, there is a sufficient likelihood that the contents of the interview likely determined the outcome in this case. Because the evidence introduced through the videotape was relevant only to the witness-intimidation and witness-retaliation convictions, we reverse and remand for a new trial only with respect to these convictions.

B. DETECTIVE STREET'S EXPERT TESTIMONY

Chapple challenges the admissibility of Street's expert testimony regarding the meaning of slang terms in the Inkster community, which we address for clarity on remand. He challenges both Detective Street's qualification as an expert and the scope of his testimony. We review a trial court's decisions regarding the qualification of an expert and the admissibility of expert testimony for an abuse of discretion. *People v Murray*, 234 Mich App 46, 52; 593 NW2d 690 (1999).

Testimony from an expert witness is governed by MRE 702, which provides:

> If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

"An expert witness may offer an opinion only if he or she has specialized knowledge that will assist the trier of fact to understand the evidence." *People v Carll*, 322 Mich App 690, 699; 915 NW2d 387 (2018).

Michigan courts have generally recognized that law enforcement officers can acquire specialized knowledge from their training and experience that may assist a lay jury's understanding of evidence. See, e.g., *People v Williams (After Remand)*, 198 Mich App 537, 542; 499 NW2d 404 (1993) (a police officer was properly qualified as an expert to explain how innocuous household items can have an alternative use in the illicit drug trade). Likewise, federal courts have recognized that expert testimony may be necessary to help jurors understand "the meaning of coded drug language" and "cryptic slang" used by narcotics dealers. *United States v Avalos*, 817 F3d 597, 601 (CA 8, 2016) (citations omitted). "In cases involving coded drug phrases, the rule requires that the expert base her opinion on personal experience and training and not merely upon the hearsay testimony of non-witness drug dealers." *Id*. (quotation marks and citation omitted).

Chapple argues that Detective Street was not qualified to offer testimony regarding the meaning of the term "green light" because he lacked formal training in linguistics. MRE 702 allows an expert may be qualified "by knowledge, skill, experience, training, *or* education." (Emphasis added.) "[T]he word 'or' is a disjunctive, used to indicate a disunion, a separation, an alternative." *People v Allen*, 507 Mich 597, 607 n 16; 968 NW2d 532 (2021) (quotation marks and citation omitted). Thus, any of the credentials of "knowledge, skill, experience, training, or education" may suffice to qualify a person as an expert. The trial court determined that Detective Street was qualified by experience.

At trial, Detective Street testified that he worked for the Michigan State Police, but he was assigned to work within the Inkster Police Department investigating homicides and nonfatal shootings in that city. His work required him to converse with people who lived in or spent time in Inkster "[e]very day, all day long," and he claimed to have "a good rapport with most of the public in Inkster." Further, he previously worked as an undercover officer in a neighboring county, which involved speaking with civilians in that county. He explained that, through his work, he became familiar with different slang terms used in communities in southeast Michigan that another person may not be familiar with. He also explained that some areas use different slang terms, or use words differently, while other terms are used more generally. Street's testimony established that through his experience investigating violent crimes and interacting daily with the public in Inkster, he acquired specialized knowledge of the use of slang terms commonly used in that community, the meaning of which may not be apparent to ordinary laypersons. Accordingly, the trial court did not err by qualifying Street, on the basis of his experience, as an expert in the use and meaning of slang terminology in the Inkster community, where Chapple lived and grew up.

Chapple argues further that Street talking to others was not a reliable method for determining the meaning of different slang terms. Because Chapple did not object to Street's testimony on this basis at trial, this claim is unpreserved. See MRE 103(a)(1); *People v Aldrich*, 246 Mich App 101, 113; 631 NW2d 67 (2001). We review unpreserved issues for plain error affecting Chapple's substantial rights. See *People v Cooper*, 309 Mich App 74, 88; 867 NW2d 452 (2015).

Chapple does not fully explain why Street's interactions with members of the Inkster community should be deemed an unreliable method for learning and understanding specific jargon and codewords regularly used in that area. Street's work with confidential informants and his undercover operations required him to communicate with persons involved in criminal activity, including persons who feared retaliation for snitching. Intuitively, engaging in frequent conversations is a reliable method for learning and understanding the meaning of slang and verbal shortcuts. Chapple has failed to establish error, let alone plain error affecting his substantial rights, with respect to this issue.

Chapple also argues that Street improperly invaded the province of the jury by offering his opinion that Chapple's instructions to "green light" Demetrius meant to solicit his murder. Chapple concedes that there was no objection to Street's testimony regarding the meaning of Chapple's use of the term "green light," leaving this issue unpreserved. See MRE 103(a)(1); *Aldrich*, 246 Mich App at 113. Accordingly, we review this issue for plain error affecting Chapple's substantial rights. See *Cooper*, 309 Mich App at 88.

"Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." MRE 704; see also *People v McFarlane*, 325 Mich App 507, 519; 926 NW2d 339 (2018). However, an expert witness should not be "permitted to . . . phrase his opinion in terms of a legal conclusion. In th[is] case, the claim is that the . . . the province of the jury is invaded." *Id.*, quoting *People v Drossart*, 99 Mich App 66, 75; 297 NW2d 863 (1980). Similarly, an expert witness may not offer an opinion about whether the defendant is guilty or innocent, *People v Fomby*, 300 Mich App 46, 53, 831 NW2d 887 (2013), and may not tell the jury how to decide the case, *Drossart*, 99 Mich App at 79.

Chapple cites caselaw that addresses the scope of expert testimony concerning drug trafficking, gang activity, and behavior of sexual abuse victims. Drug-profile evidence is a compilation of characteristics often displayed by drug traffickers. *Murray*, 234 Mich App at 52. Drug-profile evidence "is inherently prejudicial" because "these characteristics may not necessarily be connected to or inherently part of the drug trade . . . [and] could apply equally to innocent individuals as well as to drug dealers." *Id.* at 53. In *People v Hubbard*, 209 Mich App 234, 241; 530 NW2d 130 (1995), this Court held that drug-profile evidence is not admissible as substantive evidence of guilt. In *Murray*, 234 Mich App at 53-54, this Court distinguished between drug-profile evidence and expert testimony "to explain the significance of items seized and the circumstances obtaining [sic] during investigation of criminal activity."

Detective Street's testimony was not comparable to drug-profile testimony used as substantive evidence of a defendant's guilt, and he did not invade the province of the jury. Street did not improperly opine on a legal issue or that Chapple was guilty by interpreting, based on his experience, the meaning of "green light." He offered his opinion that Chapple's request to "green

light" Demetrius was a request to kill him. The jury retained its role of determining whether Chapple actually used the term "green light" in that way, and if he did, whether the remaining elements of the witness-intimidation and witness-retaliation charges were proven beyond a reasonable doubt, particularly considering Halimon's testimony denying that he felt threatened or intimidated.

In sum, Detective Street's testimony did not impermissibly invade the province of the jury. Accordingly, we reject Chapple's ineffective assistance claim on this issue, since any objection would have been futile. *People v Isrow*, 339 Mich App 522, 532; 984 NW2d 528 (2021) ("Failure to raise a futile objection or advance a meritless argument does not constitute ineffective assistance of counsel."). Ultimately, we perceive no error in Street's qualification as an expert witness, nor in the admissibility or substance of his testimony.

We reverse Chapple's convictions of witness tampering and witness intimidation and remand for a new trial on those charges. We do not retain jurisdiction.

/s/ Elizabeth L. Gleicher
/s/ Kristina Robinson Garrett
/s/ Allie Greenleaf Maldonado