*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* G. VANDERARK, Minor.

UNPUBLISHED
September 19, 2024

No. 369645
Muskegon Circuit Court
Family Division
LC No. 22-003142-NA

Before: N. P. HOOD, P.J., and O'BRIEN and REDFORD, JJ.

PER CURIAM.

In this case arising from a child protective proceeding, respondent-mother appeals by right the trial court's order terminating her parental rights to the minor child, GV. The trial court terminated respondent's parental rights under MCL 712A.19b(3)(b)(*i*), (b)(*ii*), (c)(*i*), (c)(*ii*), (h), (j), (k), and (m). On appeal, respondent claims that the trial court abused its discretion when it admitted gruesome images and videos depicting the condition of, as well as respondent's treatment of, her 15-year-old son, TF, whom she was convicted of abusing and murdering. She further claims that the evidence did not support the trial court's findings that the Department of Health and Human Services (the Department) established grounds for termination by clear and convincing evidence or that termination was in GV's best interests. We conclude that respondent has not identified any errors and accordingly affirm.

## I. BASIC FACTS

Respondent had four children from a previous relationship. TF was one of those children. Respondent and her first husband divorced, and respondent subsequently married a man named Adam. Respondent and Adam had GV in 2014. Respondent's adult son, Paul, came to live with respondent, Adam, and GV in May 2020 after Paul's father (respondent's ex-husband) kicked Paul out. Respondent's ex-husband sent TF to live with respondent in May 2021. TF had autism spectrum disorder, attention deficit hyperactivity disorder, and bipolar disorder. According to respondent, her ex-husband sent TF to live with her because her ex-husband could no longer handle TF's behaviors.

-1-

Adam suffered a stroke in January 2022. Because he could no longer care for himself, Adam went to live with his parents. He had hoped to return to his home with respondent after rehabilitation. Adam died during the pendency of these proceedings.

On July 6, 2022, respondent called 911 and reported that TF was not breathing. Emergency responders pronounced TF dead upon their arrival. They discovered that TF was emaciated and saw bruising on his torso. Respondent told emergency responders that TF had been on a hunger strike.

The Department investigated the circumstances surrounding TF's death and removed GV from respondent's care. The Department petitioned to terminate respondent's parental rights in July 2022. Respondent pleaded no contest to allegations that established jurisdiction in May 2023. The parties agreed to postpone the termination hearing until after respondent's criminal trial related to TF's death.

A jury convicted respondent of felony murder in relation to TF's death in December 2023. The trial court held a termination hearing over two days in January 2024. The trial court heard testimony and considered evidence detailing horrific abuse that respondent inflicted on TF and heard testimony about how that abuse affected GV. At the conclusion of the hearing, the trial court found that the Department had proved the identified grounds for terminating respondent's parental rights and found that termination was in GV's best interests. The trial court then entered an order terminating respondent's parental rights.

Respondent now appeals by right.

## II. GRUESOME IMAGES AND VIDEOS

Respondent first argues that the trial court erred when it denied her motion in limine to preclude the Department from admitting images of TF when he was found dead and admitting video clips that depicted TF's last hours.

### A. STANDARD OF REVIEW

This Court reviews for an abuse of discretion a trial court's evidentiary decisions. *People v McFarlane*, 325 Mich App 507, 517; 926 NW2d 339 (2018). A trial court abuses its discretion when it selects an outcome that falls outside the range of principled outcomes. See *In re Utrera*, 281 Mich App 1, 15; 761 NW2d 253 (2008). This Court reviews de novo whether the trial court properly applied the rules of evidence. *McFarlane*, 325 Mich App at 517. A trial court necessarily abuses its discretion when it admits evidence that is inadmissible as a matter of law. *Id*.

### B. ANALYSIS

Because the Department requested termination at the initial disposition on the basis of aggravated circumstances, see MCL 722.638(2), the trial court had to order termination of respondent's parental rights if it found, among other things, that the Department proved by clear and convincing legally admissible evidence one or more specified grounds for termination, see MCR 3.977(E)(3). The rules of evidence provide that relevant evidence is admissible unless

-2-

excluded by the Constitutions of the United States or Michigan, by the rules of evidence, or by other rules prescribed by the Supreme Court. See MRE 402. Evidence is relevant if it has any tendency to make a fact that is of consequence to the action more or less probable than it would be without the evidence. MRE 401.

On appeal, respondent does not argue that the images or videos were irrelevant; she argues instead that—even though relevant—the trial court should have excluded the images under MRE 403 because they were too gruesome to be fairly considered. MRE 403 provides that a trial court has discretion to exclude otherwise admissible evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." A trial court may not exclude evidence under MRE 403 simply because it is prejudicial; the rule only provides for the exclusion of evidence that is *unfairly* prejudicial. *People v McGhee*, 268 Mich App 600, 607; 709 NW2d 595 (2005). "Evidence is unfairly prejudicial when there exists a danger that marginally probative evidence will be given undue or preemptive weight by the jury." *People v Crawford*, 458 Mich 376, 398; 582 NW2d 785 (1998).

In this case, the Department sought to prove several grounds for terminating respondent's parental rights that involved proof of how she treated GV's sibling, TF. Under MCL 712A.19b(3)(b), the Department had to prove, in relevant part, that respondent either physically injured TF or that she had the opportunity to prevent TF from suffering an injury and failed to prevent the injury. The Department also sought to prove that respondent abused TF and, in relevant part, that the abuse amounted to torture, severe physical abuse, murder, or aiding and abetting murder, as provided under MCL 712A.19b(3)(k). Similarly, the Department sought to prove that respondent was convicted of murdering TF, and that—under the circumstances— termination would be in GV's best interests as provided under MCL 712A.19b(3)(m). Because the nature and extent of respondent's mistreatment of TF was an element of each of these grounds for termination, the Department had the right to offer all relevant evidence to prove that element, even if respondent did not dispute the element. See *People v Mills*, 450 Mich 61, 70-71; 537 NW2d 909 (1995). The Department could also present evidence concerning how respondent treated TF to prove how she might treat GV under the doctrine of anticipatory neglect. See *In re Kellogg*, 331 Mich App 249, 258-259; 952 NW2d 544 (2020).

The Department presented extensive evidence that respondent orchestrated and actively participated in a weeks-long campaign of torturing and starving TF. The evidence showed that she put in place steps to prevent TF from eating and drinking anything other than bread and small amounts of water. There was evidence that she locked the refrigerator, freezers, and pantry to prevent TF from getting food on his own. She instructed Paul to prevent TF from eating when she was not there, and she put cameras in place to monitor TF's activities remotely so that she could intervene and ensure that he was unable to eat or drink. In one text exchange, for example, respondent learned that TF tried to eat a butterscotch candy, and respondent instructed Paul to use a toothbrush to force TF to vomit. Paul responded that that was not necessary because he got to TF before he was able to eat the candy.

The text exchanges also established that respondent forced TF to endure repeated punishments for trying to eat or drink, or otherwise failing to comply with her extreme behavioral requirements. She forced TF to run up and down the stairs, forced him to endure hours-long ice

-3-

baths, forced him to stand with his nose to a wall and his hands above his head, forced him to eat bread soaked in hot sauce, and doused his mouth with hot sauce. Respondent also prevented TF from using the bathroom, forced him to wear adult diapers, restrained him with shackles and zip ties, and locked him in a darkened closet at night.

The Department also presented the medical examiner's findings to establish that TF had "profound emaciation due to starvation with a weight and body mass index at the 0 percentile." TF also had "severe dehydration." The medical examiner opined that TF died from dehydration and emaciation because of malnutrition and starvation, with exogenous hypothermia as a contributing factor.

Examined together, the text messages and medical report established beyond a reasonable doubt that respondent participated in, and aided and abetted, the torture and murder of TF through abusive punishments and starvation. Nevertheless, the texts and reports did not adequately convey the full import of respondent's acts, and the Department was not required to limit the evidence to testimony about TF's appearance or descriptions of the images and videos. See *People v Boshell*, 337 Mich App 322, 332; 975 NW2d 72 (2021).

Witness testimony and the medical examiner's report indicated that TF was emaciated, but the images and videos depicted what it meant for a 15-year-old child to be emaciated. The images showed TF with sunken eyes and skin stretched so tightly over his skull that one could see every boney prominence on his face. The images also showed that he had an impossibly tiny waistline, that he had bruising over his torso, and that he had so little flesh on him that one could see his rib bones and spinal vertebrae. In sum, the images showed that TF looked like a skeleton by the time of his death.

The video evidence corroborated the inferences from the images and provided further context. In the first video, the finder of fact could see respondent dragging TF by his skeletal arm into the darkened closet where she locked him away on the night of his death. The video plainly showed that TF had no strength to walk, let alone resist. It showed too that respondent placed a tarp in the closet for TF's bedding and then arranged his emaciated body on the tarp. While arranging him, one can see that TF's hips had no flesh on them—the bones stuck out sharply. There was also no muscle on his thighs, and one could see that respondent had him in an adult diaper. Throughout the ordeal, the video showed that TF's head moved without volition until respondent repositioned it to face the camera. Thereafter, TF made only slight movements in the night. The second video showed respondent discovering that TF had died when she checked on him in the morning. The video established that respondent moved TF's body from the closet before calling 911 in an apparent effort to conceal the circumstances under which he died.

The images and videos were not marginally probative; they strongly corroborated Lieutenant Joel Hoeksema's testimony and the medical examiner's report that TF was emaciated, dehydrated, and starving at the time of his death. The finder of fact was "entitled to view the nature and extent of the injuries for itself, and not to depend solely" on testimony and other evidence. *Mills*, 450 Mich at 72-73.

Additionally, the images and videos were highly probative of several other matters at issue that could not be proved through testimony and documentary evidence. The images and videos

-4-

showed what respondent, Paul, and GV would have seen on a daily basis over the last days of TF's life. Any finder of fact viewing the images and videos would immediately infer that respondent had to have known that TF was starving and close to death when she dragged him by his arm into the closet after subjecting him to hours of torture in an ice bath. Only with that video could the finder of fact see how cruel respondent's actions truly were. The level of respondent's cruelty implicated both the doctrine of anticipatory neglect and whether termination was in GV's best interests.

The images and videos also permitted an inference that TF's horrific appearance must have developed over a significant period. In that way, the video evidence corroborated the evidence from the text messages that respondent knowingly starved TF over several weeks. It also provided context for the evidence about TF's punishments. Forcing a child to stand against a wall or run up and down stairs might not seem particularly depraved when described by a witness in isolation, but when that evidence was considered with the images and videos depicting how frail and emaciated TF was by the time of his death, the evidence about the punishments was brought into an entirely different light. Indeed, when the evidence from the texts are considered with the images and videos, a finder of fact could infer that respondent tortured an emaciated and helpless child with the intent to maximize his suffering.

The images and videos also showed what GV would have seen when he looked at TF in the days leading up to TF's death. The images and videos were strong evidence that GV had to have known that respondent and Paul were deliberately starving and torturing TF. The images and videos helped the finder of fact better understand GV's statements at his forensic interview as well. GV repeatedly emphasized that he was a good boy—unlike TF—and so he did not get punishments like TF; GV seemed worried about being labeled a "bad boy." GV also noted that TF was not allowed to talk to him during this time. He explained that TF kept asking him to do things for him. The sad inference was that TF was asking his then seven-year-old brother to help alleviate his suffering. When considered with the forensic interview, the images and videos permitted an inference that respondent's decision to abuse and starve TF while GV resided in the house, and with GV's almost certain knowledge of TF's condition and distress, also amounted to abuse or neglect of GV.

The images and videos were highly probative and were not merely cumulative to other less prejudicial evidence. See *id*. at 75-76. The images and videos were the most compelling evidence of TF's condition and appearance in the days before his death. They also corroborated testimony and evidence, and permitted further inferences beyond that which the other evidence provided when considered in isolation. Ultimately, the probative value of the evidence was so high that it was unlikely that the finder of fact would give the evidence such undue weight that the admission threatened the fairness and accuracy of the proceeding. See *People v Vasher*, 449 Mich 494, 501-502; 537 NW2d 168 (1995). Moreover, as was the case in *Mills*, the trial court only admitted a limited number of images and videos. Accordingly, it appears that the trial court admitted the images and videos necessary to furthering the probative force without being too repetitive or gruesome. See *Mills*, 450 Mich at 78. On this record, the trial court's decision to admit the three images and the two videos did not fall outside the range of principled outcomes. See *In re Utrera*, 281 Mich App at 15.

### III. GROUNDS FOR TERMINATION

We next address respondent's claim that the trial court erred when it found that the Department established grounds to terminate her parental rights.

### A. STANDARD OF REVIEW

This Court reviews for clear error a trial court's finding that the Department established by clear and convincing evidence a ground for termination. See *In re Mason*, 486 Mich 142, 152; 782 NW2d 747 (2010). A trial court's finding is clearly erroneous when, on the entire evidence, this Court has the definite and firm conviction that the trial court made a mistake. *Id*. at 430-431.

### B. ANALYSIS

A trial court may terminate a parent's parental rights if it finds that the Department has established at least one ground for termination by clear and convincing evidence. See MCL 712A.19b(3); *In re Gonzales/Martinez*, 310 Mich App at 431. The trial court in this case found that the Department established grounds for termination under MCL 712A.19b(3)(b)(*i*), (b)(*ii*), (c)(*i*), (c)(*ii*), (h), (j), (k), and (m).

In the portion of her brief on appeal supposedly disputing these statutory grounds for termination, respondent does not discuss any one of the eight grounds. Instead, she argues in essence that the trial court should not have relied on the doctrine of anticipatory neglect to establish each of these grounds for termination because—in her view—the differences between TF and GV made it unlikely that GV was in any danger in her care. In the four pages of her brief that she devoted to discussing this claim of error, respondent does not discuss the elements that the Department had to prove to establish any of these grounds for termination. She likewise does not discuss the specific findings made by the trial court in support of any of these grounds for termination. By failing to offer any meaningful analysis of the law or facts applicable to this claim of error, respondent has abandoned it on appeal. See *In re Rippy*, 330 Mich App 350, 362 n 5; 948 NW2d 131 (2019).

Respondent's cursory treatment of the grounds for termination also affects this Court's ability to grant her relief. Whether respondent would neglect or abuse GV was arguably an element of several of the grounds for termination found by the trial court, see MCL 712A.19b(3)(b)(*i*), (b)(*ii*), (j), (k), and (m), but abuse and neglect were not necessary elements of every ground for termination, see MCL 712A.19b(3)(c)(*i*), (c)(*ii*), and (h). A trial court may terminate a parent's parental rights on the basis of any one ground for termination. See MCL 712A.19b(3); *In re Gonzales/Martinez*, 310 Mich App at 431. Because respondent's argument does not identify an error for each of the grounds for termination found by the trial court, we would have to affirm even if we were to agree with portions of respondent's claim of error. See *In re Sanborn*, 337 Mich App 252, 273; 976 NW2d 44 (2021) ("If the trial court did not clearly err by finding one statutory ground existed, then that one ground is sufficient to affirm the termination of respondent's parental rights.").

Even setting aside these deficiencies, respondent's statutory-grounds argument on appeal is entirely unsupported by the record. Her argument depends on ignoring the trial court's findings,

ignoring significant evidence presented at trial, and viewing the remaining evidence in an unreasonable light.

Respondent first maintains that the trial court should not have relied on the doctrine of anticipatory neglect to find that she posed a danger to GV. She argues in relevant part that the evidence showed that she had a bond with GV and that she tried to protect him from the things that were happening in the house. Because of these facts and the differences between GV and TF in terms of their age and diagnoses, she contends that GV would not be in danger of neglect or abuse in her care. Stated more bluntly, respondent argues that she would never torture and starve GV because GV did not have TF's challenging behaviors, and because she had a caring bond with GV. The evidence does not support respondent's position that the trial court misapplied the doctrine of anticipatory neglect.

The doctrine of anticipatory neglect recognizes that how a parent has treated one child is probative of how that parent will treat another child. *In re Kellogg*, 331 Mich App 249, 259; 952 NW2d 544 (2020). Although the doctrine provides that evidence of harm to one child may permit inferences about how a parent will treat another child, factual differences between the children and their situations may lessen the probative value of the inferences to be drawn from the evidence that a parent abused or neglected a different child. See *id*. at 259-261.

The evidence that respondent used extreme punishments against TF for even trivial infractions of her rules, and that she was willing to see her punishments through even when they clearly amounted to physical, mental, and emotional abuse, was highly relevant to how she might treat another child with behavioral issues. Respondent makes much of the fact that GV did not have the same diagnoses as TF and notes that they had a good bond, but she overstates the import of these differences. Although GV was not diagnosed with autism, it was evident from the forensic interview that he had concerning behaviors. The caseworker assigned to GV was for a time concerned that GV might be on the autism spectrum given his poor eye contact, gestures, and other social markers. GV was also diagnosed with attention deficit/hyperactivity disorder, as TF had been diagnosed. GV was much younger than TF and his behaviors were likely more manageable as a result, but there was no guarantee that GV's behavioral concerns would not increase as he matured into his teenaged years. A reasonable finder of fact could infer that respondent would use the same punishment regimen to try and control GV if he too started to behave in a way that angered her. When asked on cross-examination, respondent herself could not guarantee that she would not punish GV in the same way if—to use her own words involving TF—GV tried to "out stubborn" her, like TF supposedly did. Therefore, the trial court did not misapply the law when it used the evidence of how respondent treated TF to infer that she might impose similar abuse on GV. See *id*.

Additionally, contrary to respondent's strained interpretation of the record, there was strong evidence that respondent's actions involving TF directly harmed GV. The trial court found that any "reasonable person" would have seen that TF was dying from starvation, and the video evidence clearly supported that finding. The court further noted that respondent can be heard on the video yelling at TF while he was in that condition, which evinces an unfathomable depth of callousness and cruelty.

The trial court cited evidence that the living space within the home was quite small and that GV's bedroom was next to the living space and bathroom where TF was repeatedly punished and where he dwelled while slowly starving to death. GV spent the majority of his waking moments in the same space as TF, and it was reasonable to infer on this record that he must have seen and heard the abuse perpetrated against TF. Indeed, GV's statements at the forensic interview give the overwhelming impression that GV knew what was happening to his half-brother.

GV described the punishments that TF underwent—including being forced to consume hot sauce and being forced to stand against the wall. GV also discussed how, if Paul ever got angry with him, he would use tears to get Paul to feel sorry for him, but when TF tried that, everyone knew that TF was faking because he was older. GV's statement permitted an inference that he had seen TF in distress and observed that Paul and respondent did not feel sorry for TF in the same way that they would have felt sorry for him. GV also knew that respondent would use leg and arm cuffs on TF whenever she wanted. He also knew that TF was prohibited from eating and drinking and that he would be "breaking punishment" if he ate or drank more than permitted. GV also knew that respondent monitored TF remotely through cameras and explained that the cameras would distort one's voice when you spoke through them. He also knew that respondent decided that TF had to stay in the little room because he was a bad boy.

GV also stated that Paul got "maximum mad" with TF, and the text messages show that respondent guided and instructed Paul on how to punish and control TF. A reasonable finder of fact could infer that GV understood that respondent played a role in Paul's angry outbursts and that she used him to punish TF. GV specifically discussed the yelling in the household and told the interviewer that, when he went to stay at "grammy's house," there was no "chaos." GV also discussed "throwing" TF away in the graveyard and spoke of TF in terms that suggested that GV had been taught to devalue TF or, at the very least, learned to devalue him by way of example. As the trial court aptly stated, it was "not sure [TF] was a human being to [GV]" by the time GV was interviewed.

The testimony and evidence also supported an inference that GV had been traumatized by these events. In the forensic interview, GV repeatedly noted that TF was a "bad boy," whereas he was a "good boy." The context suggested that he needed assurances that he would never be treated like TF because, unlike TF, he was a good boy. Additionally, GV's grandfather testified that GV had triggers—such as when seeing an ad for hot sauce or adults arguing on television—that made him quiet and caused him to leave the room for time alone. GV used to cry when he saw such things, his grandfather said. GV's grandfather also stated that GV took being called a bad boy very personally.

Contrary to respondent's contention on appeal, it was not pure speculation for the trial court to find that GV witnessed enough of the extreme cruelty that was occurring in his home to have been traumatized by it. Rather, there was overwhelming circumstantial evidence that GV not only witnessed the horrors that occurred in his home but was profoundly affected by the cruelty. Accordingly, the trial court's finding that respondent directly neglected and abused GV was supported by the record evidence.

Respondent faults the trial court for purportedly trying to shift the burden of proof. The trial court did not at any point shift the burden. The trial court merely noted the troubling testimony

by respondent that strongly suggested that respondent still posed a danger to any child left in her care. The trial court cited, in particular, respondent's response to her lawyer's question: "What would you do differently?" The trial court stated that respondent's answer was so shocking that it "sealed" the court's understanding of the evidence. The court explained:

> And I was waiting for you to say . . . I would have done anything. I would have taken him to the hospital. I would have fed him. Anything. But that's not what you said. You said: "I wish I would have sent him back." He was your child. "I wish I would have sent him back." And so now, my horrific—my horrific like upset—crying, my tears, turns to anger. How dare you. How dare you.

The trial court's statements do not show that it shifted the burden. The court merely explained that it was horrified by that answer—and rightly so. Respondent's response was, in essence, that the only thing that she could have done differently was to have sent TF back to live with his father. Her answer suggested that she felt it was necessary to treat TF as she did, which was extremely disturbing and highly relevant to how she might treat another child. There was nothing improper about the trial court's observations.

The trial court also plainly rejected respondent's testimony that she did not recall torturing and starving TF because she had memory issues brought on by the stress of Adam's stroke. The trial court found that respondent knew exactly what she was doing:

> She is able to pick out the details, well, the dog food wasn't on the floor, but I don't remember what I did. Well, he's allergic to immunizations, this is whatever, but I don't remember what I did. [GV] was upstairs, not downstairs, but I don't remember what I did. I tested the alarm to see if [it] didn't bother him. These are details. These are specific details that you gave over and over. You were on that stand a long time. You gave details over and over and over and over, but you don't remember anything that happened. That's completely not credible to me. I think you knew exactly what you were doing. You were torturing.

This Court will defer to the trial court's superior ability to judge the credibility of the witnesses that appeared before it. See *In re Gonzales/Martinez*, 310 Mich App at 431. The trial court also cited respondent's incredible story that she did not recall abusing TF as evidence that she was likely to repeat her abuse if GV were returned to her care. The trial court's finding in this regard was supported by the record.

Respondent also suggests that the trial court should have taken into consideration the evidence that she was actually protecting GV from the events at issue. The fact that respondent had perpetrated such horrific abuse that she needed to shield GV from it was evidence in support of terminating her parental rights, as the trial court correctly concluded. The trial court cited evidence that respondent sent texts messages to Paul in which she stated that she did not want GV to see TF without clothing. She worried that GV might see TF when Paul left for work and before she got home. She complained that she could not work under these conditions, and she blamed TF for doing this to her. The trial court correctly noted that respondent created the conditions and yet still managed to frame the issue as though TF had forced her to starve him. The trial court also

correctly understood that there was no possible way to shield GV from knowledge about what was happening. As GV stated in his interview, it must have been "scary" for TF on the day he died.

Respondent has not identified any errors in the trial court's findings in support of its determination that the Department proved the identified grounds for terminating respondent's parental rights to GV by clear and convincing evidence. See *id*. at 430-431.

## IV. BEST INTERESTS

We lastly address respondent's claim that the trial court erred when it found that termination was in GV's best interests.

## A. STANDARD OF REVIEW

This Court reviews for clear error a trial court's finding that termination is in the child's best interests. See *In re Gonzales/Martinez*, 310 Mich App at 430. A trial court's finding is clearly erroneous when, on the entire evidence, this Court has the definite and firm conviction that the trial court made a mistake. *Id*. at 430-431.

## B. ANALYSIS

Once the trial court determined that the Department had established grounds for terminating respondent's parental rights, the trial court had to determine whether termination was in GV's best interests. See MCL 712A.19b(5); *In re Moss*, 301 Mich App 76, 90; 836 NW2d 182 (2013).

As this Court has explained:

> To determine whether termination of parental rights is in a child's best interests, the court should consider a wide variety of factors that may include the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home. The trial court may also consider a parent's history of domestic violence, the parent's compliance with his or her case service plan, the parent's visitation history with the child, the children's well-being while in care, and the possibility of adoption. [*In re White*, 303 Mich App 701, 713-714; 846 NW2d 61 (2014) (quotation marks and citation omitted).]

On appeal, respondent argues that the evidence did not demonstrate that termination was in GV's best interests. She contends that she was in prison—and so could not directly harm him— and was willing to arrange for his care and custody through a guardianship. She also suggests that terminating her parental rights would somehow harm GV by depriving him of the ability to seek closure and answers from respondent. Respondent's arguments are not persuasive.

The evidence showed that whatever bond GV might have had with respondent was severely strained by the events leading to TF's death. GV's therapist testified that GV had a trauma bond

-10-

with respondent, which, she explained, was a bond that occurs with a parent who caused trauma to the child. GV's own statements showed that he feared being labeled a "bad boy" because respondent did not mix well with bad boys. There was additional evidence suggesting that GV observed how cruel respondent could be, and his grandfather and therapist both noted that GV rarely discussed respondent. Given the evidence that GV suffered from triggers associated with the events at issue, the trial court could reasonably find that GV not only lacked a healthy bond with respondent but also that he would be triggered by any interactions with her.

The consensus of the expert testimony and GV's caregivers was also that it would not be healthy for GV to interact with respondent. Indeed, respondent's own expert testified that respondent was not healthy enough to interact with GV at the present time. He felt that, with six months to a year of intensive therapy, respondent might make enough progress to have interactions with GV. But he opined that, even then, whether to allow such contact would depend on GV's progress with his own therapy.

Respondent's claim that termination was not necessary because she was willing to allow a guardianship does not negate the evidence that further interaction with respondent could set GV's progress back. Although it may be unlikely that respondent would immediately seek termination of the guardianship once the trial court made its decision, it remains true that she would have the ability to affect GV's living situation, even if indirectly, had the trial court declined to terminate her parental rights. The potential for such disruptions posed a serious concern for GV's mental and emotional health and stability when considered in light of the trauma that he suffered by witnessing respondent's extreme cruelty.

Respondent's belief that termination would prevent GV from getting closure or answers from respondent was also not supported by the record. Although termination would ensure that GV's caregivers could protect GV from any harmful interactions with respondent, termination would not prevent GV's caregivers from allowing GV to have limited contact with her should GV's therapist determine that the contact would be appropriate and beneficial. GV's grandfather testified that he could not imagine things changing so that it would beneficial for GV to interact with respondent, but he stated that he would do whatever was in GV's best interests and whatever the court ordered him to do. He also acknowledged that GV might someday want to interact with respondent. He simply wanted to ensure that he had control over the contact while GV was a minor.

Other evidence showed that GV had done very well in his placement with his grandparents and that he had a strong and healthy bond with them. Given the totality of the evidence, it cannot be said that the trial court clearly erred when it found that termination was in GV's best interests. See *In re Gonzales/Martinez*, 310 Mich App at 430-431.

Affirmed.

/s/ Noah P. Hood
/s/ Colleen A. O'Brien
/s/ James Robert Redford

-11-